United States Court of Appeals,

Eleventh Circuit.

No. 95-6369.

Walter McMILLIAN, Plaintiff-Appellant,

v.

W.E. JOHNSON, Morris Thigpen, Tom Allen, Marian Shinbaum, Charlie Jones, et al., in their individual capacities, Defendants-Appellees.

July 9, 1996.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-93-699-N), W. Harold Albritton, III, Judge.

Before COX and BARKETT, Circuit Judges, and PROPST[*], District Judge.

COX, Circuit Judge:

## I. FACTS AND PROCEDURAL BACKGROUND[1]

Walter McMillian was convicted of the murder of Ronda Morrison and sentenced to death. He spent nearly six years on Alabama's death row, including over a year before his trial. The Alabama Court of Criminal Appeals ultimately overturned McMillian's conviction because of the state's failure to disclose exculpatory and impeachment evidence. *McMillian v. State,* 616 So.2d 933 (Ala.Crim.App.1993). The state then dismissed the charges against McMillian and commenced a new investigation.

Finally released after six years on death row, McMillian brought a § 1983 action against various officials involved in his

---

[*]Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

[1]For a more detailed recitation of the facts, see our opinion in No. 95-6123, also decided today.

arrest, incarceration, and conviction. McMillian alleges federal constitutional claims, as well as pendent state law claims. McMillian sued several defendants, including Thomas Tate, the Sheriff of Monroe County, Alabama, in both his individual and official capacities, and Monroe County itself. McMillian seeks damages from Sheriff Tate individually and from Monroe County for, *inter alia,* causing his pretrial detention on death row, manufacturing inculpatory evidence, and suppressing exculpatory and impeachment evidence.[2]

McMillian's theory of county liability is that Sheriff Tate's "edicts and acts may fairly be said to represent [the] official policy [of] ... Monroe County ... in matters of criminal investigation and law enforcement." (First Amended Complaint ¶ 53.) The district court granted Monroe County's motion to dismiss, relying on our since-vacated decision in *Swint v. City of Wadley, Ala.,* 5 F.3d 1435 (11th Cir.1993), *vacated sub nom. Swint v. Chambers County Comm'n,* --- U.S. ----, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), to hold that Monroe County is not liable for Sheriff Tate's actions under § 1983 because sheriffs in Alabama are not final policymakers for their counties in the area of law enforcement. In a later order, the district court granted in part

---

[2]A suit against a public official in his official capacity is, in all respects other than name, treated as a suit against the local government entity he represents, assuming that the entity receives notice and an opportunity to respond. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). We treat McMillian's claims against Tate in his official capacity and the claims against Monroe County as stating the same claims because McMillian contends that Sheriff Tate represents Monroe County. Whether McMillian's contention is meritorious is at issue on this appeal.

and denied in part various defendants' motions for summary judgment in their individual capacities. Pursuant to 28 U.S.C. § 1292(b), we granted McMillian permission to appeal the district court's interlocutory orders.

## II. ISSUES ON APPEAL

We address two issues on this appeal: (1) whether a sheriff in Alabama is a final policymaker for his or her county in the area of law enforcement; and (2) whether hearsay may be used to establish the existence of a genuine issue of material fact to defeat a motion for summary judgment when it is not shown that the hearsay will be reducible to an admissible form at trial.[3]

## III. DISCUSSION

A. *Whether a Sheriff in Alabama is a Final County Policymaker*

1. *Contentions of the Parties*

McMillian contends that our decision in *Swint* is of no precedential or persuasive value because the Supreme Court granted certiorari and then vacated our decision on jurisdictional grounds. In any event, he contends, *Swint* was wrongly decided. McMillian urges that this case is controlled by *Pembaur v. City of*

---

[3]McMillian raises two other issues on this appeal. First, he contends that the district court erroneously required him to prove violence or torture on his claim that the state coerced witnesses to give false testimony. We do not read the district court's opinion to impose such a requirement on McMillian.

Second, McMillian contends that the district court erred in granting partial summary judgment on certain of his claims. The district court evaluated McMillian's allegations incident by incident and determined whether a genuine issue of material fact exists as to each incident. McMillian's contention that the district court erred in evaluating the evidence this way is meritless. *See* 11th Cir.R. 36-1.

*Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), in which the Supreme Court affirmed the Sixth Circuit's holding that an Ohio sheriff could establish county law enforcement policy under appropriate circumstances. According to McMillian, the relevant facts here are the same as in *Pembaur:* in Alabama, the sheriff is elected by the county's voters, is funded by the county treasury, and is the chief law enforcement officer within the county. McMillian argues that our decision holding that Alabama sheriffs are final county policymakers in the area of jail administration, *see Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989), also compels a holding that Alabama sheriffs are final policymakers in the area of law enforcement.

Monroe County contends that *Swint* correctly held that Alabama sheriffs are not county policymakers in the area of law enforcement because, under state law, Alabama counties have no law enforcement authority. In addition, according to the county, holding it liable for the actions of a sheriff would be contrary to the Supreme Court's reasoning in *Monell* in two respects. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). First, because counties have no control over sheriffs, allowing county liability for a sheriff's actions would ignore *Monell* 's conception of municipalities as corporations and substitute a conception of municipalities as mere units of geography. Second, holding the county liable for a sheriff's actions would impose even broader liability than the *respondeat superior* liability rejected in *Monell.* Finally, Monroe County argues that cases from our circuit, as well as the better reasoned

cases from other circuits, require a "functional" analysis looking to whether the county has control over the sheriff or has other power in the area of the sheriff's actions.

2. *County Liability for Acts of Final Policymakers*

A municipality, county, or other local government entity is a "person" that may be sued under § 1983 for constitutional violations caused by policies or customs made by its lawmakers or by "those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037-38. A municipality may be held liable for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision. *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion); *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298. A municipality may not be held liable, however, solely because it employs a tortfeasor, that is, under a *respondeat superior* theory. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. The line between actions embodying official policy—which support municipal liability—and independent actions of municipal employees and agents—which do not support municipal liability—has proven elusive.

The Supreme Court has provided limited guidance for determining whether an official has final policymaking authority with respect to a particular action. In the Court's earliest attempts to establish the contours of municipal liability, a majority of the Court was unable to agree on the appropriate

approach to final policymaker status. *See Pembaur,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452; *Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107. In *Jett,* though, Justice O'Connor's approach in *Praprotnik* garnered the support of a majority of the Court. *See Jett,* 491 U.S. at 737, 109 S.Ct. at 2723-24. We draw from Justice O'Connor's opinion, as adopted in *Jett,* several principles to guide our decision.

Most important is the principle that state law determines whether a particular official has final policymaking authority. *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924. We must look to state and local positive law, as well as custom and usage having the force of law. *Id.* at 124 n. 1, 108 S.Ct. at 924 n. 1. Identifying final policymakers may be a difficult task, but state law always should direct us "to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125, 108 S.Ct. at 925. We may not assume that final policymaking authority lies in some entity other than that in which state law places it. *Id.* at 126, 108 S.Ct. at 925. To the contrary, we must respect state and local law's allocation of policymaking authority. *Id.* at 131, 108 S.Ct. at 928.

Two more principles guide our inquiry. First, "the authority to make municipal policy is necessarily the authority to make *final* policy." *Id.* at 127, 108 S.Ct. at 926. Second, the alleged policymaker must have final policymaking authority with respect to the action alleged to have caused the particular constitutional or statutory violation. *Id.* at 123, 108 S.Ct. at 924; *Jett,* 491 U.S.

at 737, 109 S.Ct. at 2724.  An official or entity may be a final policymaker with respect to some actions but not others.  *See Pembaur,* 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12.  With respect to a particular action, more than one official or body may be a final policymaker;  final policymaking authority may be shared.  *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.

3. *Our Holding in Swint*

We have already addressed whether, in Alabama, sheriffs are final policymakers for their counties in the area of law enforcement.  *Swint v. City of Wadley, Ala.,* 5 F.3d 1435.  In *Swint,* we held that sheriffs are not final policymakers for their counties in the area of law enforcement because counties have no law enforcement authority.  *Id.* at 1451.  We agree with McMillian that, because the Supreme Court held that we lacked jurisdiction in *Swint* and vacated our decision, *Swint* is not binding precedent.  McMillian argues further that the Supreme Court questioned our holding on the merits in *Swint* and that *Swint* is of no persuasive value.  Though we decline to draw any inference from the Supreme Court's grant of certiorari, we have taken a fresh look at *Swint* and the issue before us.

We recognized in *Swint* that an official with final policymaking authority in a particular area of a municipality's business may subject the municipality to § 1983 liability through her actions within that authority.  *Id.* at 1450 (citations omitted).  In *Swint,* the plaintiff sought to hold Chambers County, Alabama, liable for raids authorized by its sheriff.  To determine whether the Chambers County Sheriff possessed final policymaking

authority for Chambers County in the area of law enforcement, we looked to Alabama law, as required by *Jett* and *Praprotnik.* *Id.* We noted that a sheriff is a state rather than a county official under Alabama law for purposes of imposing respondeat superior liability on a county. *Id.* (citing *Parker v. Amerson,* 519 So.2d 442 (Ala.1987)). However, that fact was not dispositive. *Id.* (citing *Parker v. Williams,* 862 F.2d at 1478).

The critical question under Alabama law, we emphasized, is whether an Alabama sheriff exercises county power with final authority when taking the challenged action. *Id.* (citing *Parker v. Williams,* 862 F.2d at 1478). Our examination of Alabama law revealed that Alabama counties have no law enforcement authority. *Id.* Alabama counties have only the authority granted them by the legislature. *Id.* (citing *Lockridge v. Etowah County Comm'n,* 460 So.2d 1361, 1363 (Ala.Civ.App.1984)). Alabama law assigns law enforcement authority to sheriffs but not to counties. *Id.* (citing Ala.Code § 36-22-3(4) (1991)). Thus, we concluded that a sheriff does not exercise county power when he engages in law enforcement activities and, therefore, is not a final policymaker for the county in the area of law enforcement. *Id.* at 1451. We continue to believe that this is the correct analysis.

The Supreme Court has not addressed whether a municipality must have power in an area to be held liable for an official's acts in that area. Still, we think that such a requirement inheres in the Court's municipal liability analysis. As Justice O'Connor explained in *Praprotnik,* a municipal policymaker is the official with final responsibility "in any given area of a local

government's business." 485 U.S. at 125, 108 S.Ct. at 925. A threshold question, therefore, is whether the official is going about the local government's business. If the official's actions do not fall within an area of the local government's business, then the official's actions are not acts of the local government. That *Swint* properly asked this threshold question is confirmed by our precedent, as well as cases from other circuits. *See Owens v. Fulton County,* 877 F.2d 947, 950 (11th Cir.1989) (asking whether district attorney was exercising county or state authority); *Parker v. Williams,* 862 F.2d at 1478 (asking whether sheriff was implementing county's or state's duty); *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980) (asking whether county judge was exercising county or state authority). *Accord, e.g., Eggar v. City of Livingston,* 40 F.3d 312, 314 (9th Cir.1994) (asking whether judge's acts were performed under municipality's or state's authority), *cert. denied,* --- U.S. ----, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995); *Dotson v. Chester,* 937 F.2d 920, 924 (4th Cir.1991) (asking whether sheriff wields county or state authority) (citing *Owens* and *Parker* ); *Baez v. Hennessy,* 853 F.2d 73, 77 (2nd Cir.1988) (asking whether district attorney represents county or state), *cert. denied,* 488 U.S. 1014, 109 S.Ct. 805, 102 L.Ed.2d 796 (1989); *Soderbeck v. Burnett County, Wisconsin,* 821 F.2d 446, 451-52 (7th Cir.1987) (*Soderbeck II* ) (asking whether sheriff acts on behalf of county or state).

McMillian contends that, even if *Swint* 's analytical framework is sound, *Swint* nevertheless was wrongly decided. He questions *Swint* 's conclusion that Alabama sheriffs do not exercise

policymaking authority for the county in the area of law enforcement. He argues that, since their decisions are unreviewable, sheriffs must set policy for some entity. If *Swint* is correct that they do not set county policy, he reasons, then the only alternative is that they set state law enforcement policy. According to McMillian, though, sheriffs simply cannot set state law enforcement policy. Thus, they must set county policy.

We are unpersuaded by this argument. We need not, and do not, decide whether sheriffs are state policymakers to hold that they are not county policymakers. But, to respond to McMillian's argument, we note that state law could make sheriffs final policymakers for the state, notwithstanding that they are elected by county voters and have county-wide jurisdiction. McMillian's arguments to the contrary involve the power to "set policy" in a generic sense. "Policymaker" in § 1983 jurisprudence, however, is a term of art that refers to the official or body that speaks with final authority with respect to a particular governmental decision or action. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2724.

Using "policy" generically, McMillian may be correct that, under principles of representative government, an official elected locally should not set statewide "policy." And he may be correct that, generically speaking, "policy" of a state connotes a single policy rather than one state "policy" per county. But when "policy" is understood as a § 1983 law term of art, we see no reason why a county sheriff may not be a final policymaker for the state in the area of law enforcement insofar as state law assigns sheriffs unreviewable state law enforcement power.

McMillian insists that state policy cannot be different in each county. That different entities may share final policymaking authority, *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925, however, presumes that one policymaker's actions may subject a municipality to liability even if another policymaker has a different policy. Thus, we see no anomaly in having different state policymakers in different counties. Such a situation would be no different than if each of a city's police precinct commanders had unreviewable authority over how arrestees were processed. Each commander might have a different processing policy, but that does not render a commander's policy that of her precinct as opposed to that of the city when the city is sued under § 1983 for her unconstitutional treatment of arrestees.

McMillian also argues that *Swint* conflicts with precedent from the Supreme Court and our circuit. We address those arguments below.

4. *The Supreme Court's Decision in Pembaur*

McMillian argues that the Supreme Court's decision in *Pembaur* controls his case. Based on Ohio law, the Sixth Circuit held in *Pembaur* that, in a proper case, a sheriff's acts may represent the official policy of an Ohio county. *Pembaur v. City of Cincinnati,* 746 F.2d at 341 (6th Cir.1984). Though reversing on other grounds, the Supreme Court did not question the Sixth Circuit's conclusion that a sheriff could be a county policymaker, 475 U.S. at 484, 106 S.Ct. at 1301, explaining that the Supreme Court "generally accord[s] great deference to the interpretation and application of state law by the courts of appeals." *Id.* at n. 13, 106 S.Ct. at

1301 n. 13 (citations omitted). McMillian contends that the Supreme Court explicitly affirmed the Sixth Circuit's reasoning and holding and, therefore, that the Sixth Circuit's analysis controls here. We disagree.

We do not read the Supreme Court's decision as an affirmation of the Sixth Circuit's analysis of policymaker status. The Supreme Court simply deferred to the Sixth Circuit's conclusion that a sheriff is a county policymaker because the question is one of state law. The Court did not describe or discuss the state law factors on which the Sixth Circuit based its conclusion, nor did it address any arguments about whether a sheriff is a county policymaker. Instead, the Supreme Court's analysis and holding addressed whether—assuming policymaker status—a decision by a municipal policymaker on a single occasion may subject a municipality to § 1983 liability. *Id.* at 471, 106 S.Ct. at 1294. Thus, *Pembaur* does not control the issue presented here.

Even if we were to read the Supreme Court's *Pembaur* opinion as implicitly approving the Sixth Circuit's policymaker analysis, it would not follow that an Alabama sheriff is, like an Ohio sheriff, a policymaker for her county. State law determines whether a particular official has final policymaking authority. *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924. Ohio law determined the Sixth Circuit's conclusion. But Alabama law controls our conclusion.

McMillian contends that the Ohio law factors relevant to the Sixth Circuit's decision are the same in Alabama. In both Ohio and Alabama, he argues, sheriffs are elected by the residents of their counties; receive their salaries, expenses, offices, and supplies

from their counties; and serve as the chief law enforcement officers in their counties. According to McMillian, other aspects of Alabama law are either not dispositive or irrelevant. That Alabama law deems sheriffs state rather than county officials, he argues, constitutes merely a non-dispositive label. And, he contends, whether Ohio counties have any law enforcement authority under state law was irrelevant to the Sixth Circuit's analysis, except to the extent that Ohio counties financially support the sheriff's law enforcement apparatus.

We are unpersuaded by McMillian's argument that Ohio and Alabama law are the same in all relevant respects. While we agree that similarities exist, there are differences. Under Alabama law, but not under Ohio law, a sheriff is a state officer according to the state constitution. *Parker v. Amerson,* 519 So.2d at 442. The Constitution of Alabama of 1901 provides that the state executive department "shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and *a sheriff for each county.*" Ala. Const. art. V, § 112 (emphasis added). The Alabama Supreme Court has held that sheriffs are employees of the state, not their counties, and thus that counties may not be held vicariously liable for sheriffs' actions. *Hereford v. Jefferson County,* 586 So.2d 209, 210 (Ala.1991); *Parker v. Amerson,* 519 So.2d at 442. *See also Cofield v. Randolph County Commission,* 844 F.Supp. 1499, 1502 (M.D.Ala.1994) (dismissing county from § 1983 suit because, under Alabama law, a county may not be held vicariously liable for

sheriff's actions). Moreover, as state executive officers, Alabama sheriffs generally are protected by the state's sovereign immunity under Article I, § 14, of the Alabama Constitution. *Hereford,* 586 So.2d at 210; *Parker v. Amerson,* 519 So.2d at 442. Thus, sheriffs enjoy a special status as state officers under Alabama law.

We recognize that a sheriff's designation as a state official is not dispositive, *Parker v. Williams,* 862 F.2d at 1478, but such a designation is relevant to whether a sheriff exercises state or county power. *See Soderbeck II,* 821 F.2d at 451-52; *Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285, 292 (7th Cir.) (*Soderbeck I* ) (finding provision of Wisconsin constitution prohibiting county respondeat superior liability for sheriff's acts "powerful evidence" that sheriff is not county policymaker), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985). McMillian would have us disregard Alabama's decision to make a sheriff a state official, characterizing it as nothing more than a label. [4] Instead, we heed the Supreme Court's admonition that federal courts respect the way a state chooses to structure its government. *See Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.

We also reject McMillian's argument that *Pembaur* shows that whether a county has law enforcement power is irrelevant. Though the Sixth Circuit did not cite an Ohio county's law enforcement authority as a factor in its decision, we are not convinced that

---

[4]We recognize that a state cannot insulate local governments from § 1983 liability simply by labelling local officials state officials. *Parker v. Williams,* 862 F.2d at 1479. We base our decision not on a sheriff's "label" but on a county's lack of law enforcement power, of which a sheriff's designation as a state official is evidence.

the existence of county law enforcement authority was irrelevant to its decision.  The Ohio law cited by the Sixth Circuit strongly suggests that Ohio counties have law enforcement responsibilities beyond simply providing sheriffs with funds.  Ohio law provides that "[i]n the execution of the duties required of him, the sheriff may call to his aid such persons or power of the county as is necessary."  Ohio Rev.Code Ann. § 311.07 (Baldwin 1982).  It could be that the Sixth Circuit did not mention this factor because "it is obvious that the Sheriff is a County official," *Pembaur,* 746 F.2d at 341, or simply because the county did not argue that it had no law enforcement power.  In any event, regardless of its relevance to the Sixth Circuit, we believe that the existence of county law enforcement power is a prerequisite to a finding that a sheriff makes law enforcement policy for a county.

5. *Our Holding in Parker v. Williams*

Relying on our decision in *Parker v. Williams,* McMillian contends that Alabama counties have the same degree of power in the area of law enforcement that we have found sufficient for county liability in the area of hiring and training jail personnel.  In *Parker,* we held that a sheriff exercised county power with final authority when hiring and training a jailer who raped an inmate. 862 F.2d at 1478.  We determined that counties, not the state of Alabama, have the responsibility for running jails under Alabama law, because "[i]n practice, Alabama counties and their sheriffs maintain their county jails in partnership."  *Id.* at 1478-79.

Inherent in *Parker*'s finding that counties and sheriffs maintain jails "in partnership" was a finding that counties have

some duty or authority in the area of running county jails. Put another way, only because Alabama law gives both counties and sheriffs certain power with respect to running county jails could it be said that a county's power in that area takes the form of a partnership with the sheriff. McMillian correctly notes that *Parker* does not require that a municipality act "in partnership" with a government official to be liable for the official's actions. But McMillian errs to the extent that he suggests that *Parker* disavows any requirement that a municipality possess power in a particular area for an official's actions in that area to be attributed to the municipality. *Parker* holds that a county need not directly control the sheriff to be held liable for the sheriff's actions. 862 F.2d at 1480. It does not even suggest, however, that a county need not have power in an area for a sheriff to be said to exercise county power in that area.

McMillian contends that Monroe County possesses the degree of law enforcement power required by *Parker*. *Parker* listed several features of Alabama law demonstrating that, in practice, counties share authority for running jails with sheriffs. *Parker,* 862 F.2d at 1479. *Cf. Strickler v. Waters,* 989 F.2d 1375, 1390 (4th Cir.) (state law requiring city to fund jail and keep it in good order not enough to render city liable for sheriff's actions in administering jail), *cert. denied,* --- U.S. ----, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). McMillian seizes on certain of these features to argue that counties have the requisite power in the area of law enforcement as well. McMillian is correct that certain features of Alabama law with respect to jail maintenance, primarily

those relating to county funding of the sheriff's operations, also obtain with respect to law enforcement. But McMillian's analogy fails because important aspects of Alabama law evincing county power in the jail maintenance area find no parallel in the law enforcement area.

As *Parker* notes, for example, in the area of jail maintenance, the county commission is described by state law as the "body having control over the jail," to which the state board of corrections must submit certain jail inspection reports. 862 F.2d at 1479 (citing Ala.Code § 14-6-81). Though not cited in *Parker,* other provisions of the Alabama Code further demonstrate county authority over jails. For instance, the chairman of the county commission has the power to inspect jails weekly and report the results to the grand jury. Ala.Code § 11-14-22. In contrast, Alabama law allocates to counties no similar powers in the area of law enforcement. County involvement is limited: county voters elect the sheriff and the county funds her operations.[5] Thus, it cannot be said that sheriffs and counties hold power in partnership as in *Parker,* or that counties otherwise possess the degree of law enforcement authority necessary to say that a sheriff exercises county power in that area. *But see Turner v. Upton County,* 915 F.2d 133, 136 (5th Cir.1990) (holding that sheriff is county policymaker in area of law enforcement by virtue of election by

---

[5]McMillian seems to suggest that the provision requiring sheriffs to perform certain actions in their respective counties, Ala.Code § 36-22-3(4), amounts to a grant of law enforcement power to counties. It is true that state law limits a sheriff's jurisdiction to her county. But such a geographical limitation on the sheriff's power is fundamentally different from a grant of law enforcement power to the county itself.

county voters), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991).[6]

Our conclusion that, under Alabama law, law enforcement is an exercise of state power, whereas jail maintenance is an exercise of county power, accords with our other precedent. McMillian argues that *Lucas v. O'Loughlin,* 831 F.2d 232 (11th Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1595, 99 L.Ed.2d 909 (1988), and the two Fifth Circuit cases upon which it relied demonstrate that a sheriff is a county policymaker in the area of law enforcement. He contends that the factors we relied on to hold that a Florida sheriff's termination of a deputy was an act of the county, *id.* at 235, are the same under Alabama law:  the sheriff is elected by the county, carries out his duties within the county, is funded by the county, and has absolute authority over the subject matter.  He concedes two differences between *Lucas* and his case.  *Lucas* involved appointment and control of deputies, while he challenges law enforcement activities;  and sheriffs in Alabama are state officers, while sheriffs in Florida are county officers. Nevertheless, McMillian argues that these differences are not dispositive.  Once again, we disagree.  We have already explained that an Alabama sheriff's designation as a state official is

---

[6]We note that the Fifth Circuit seems to view an officer's election by county voters as a significant, if not dispositive, factor in holding counties liable for the officer's actions under § 1983. *E.g., id.;  Crane v. State of Texas,* 766 F.2d 193, 195 (5th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985).  *But see Keathley v. Vitale,* 866 F.Supp. 272, 276 (E.D.Va.1994) (holding that election is not sufficient basis to attribute sheriff's acts to city).  As we have explained, we do not view a sheriff's election by county voters as dispositive, particularly when other factors demonstrate that a sheriff is not exercising county power.

relevant to whether she exercises county law enforcement power; we shall not belabor that point.

We also disagree with McMillian's argument that the type of action challenged makes no difference. He contends that because Sheriff Tate has absolute authority over law enforcement, just as the sheriff in *Lucas* had absolute authority over the termination of his deputy, Sheriff Tate must be a final policymaker for the county in the area of law enforcement. This argument fails for at least two reasons. First, that an official has absolute authority over an area shows only that she is a final policymaker in the area; it says nothing about whose authority she exercises in that area, i.e., whether she is a final policymaker for the county or the state. *Keathley v. Vitale,* 866 F.Supp. at 275. Second, whether the action challenged involves termination of an employee or traditional law enforcement activity is critical to whether a sheriff exercises county or state authority. *Lucas* bears this out.

In holding that the Florida sheriff acted as a county policymaker, *Lucas* relied on the distinction between an official's local power in administrative matters and her state power in other matters. We quoted two Fifth Circuit cases drawing the distinction between local duties and state duties. *Lucas,* 831 F.2d at 235. *Familias Unidas* distinguished between a Texas county judge's traditional role in the administration of county government and his role in implementing a state statute. *Familias Unidas,* 619 F.2d at 404. In that case, the Fifth Circuit held that the judge's role in implementing a state statute, "much like that of a county sheriff in enforcing a state law," effectuated state policy. *Id. Van*

*Ooteghem* similarly distinguished between a county treasurer's "effectuation of the policy of the State of Texas [and] ... discretionary local duties in the administration of county government," holding that the treasurer's "decisions regarding termination of [an employee] fall on the local not the state side of his duty: he was about the business of county government ..." *Van Ooteghem v. Gray,* 774 F.2d 1332, 1337 (5th Cir.1985). In *Lucas,* we determined that the same principle applied to the Florida sheriff's termination of a deputy; thus, the sheriff was about the business of county government, rendering the county liable for his actions under § 1983. *Lucas,* 831 F.2d at 235.

Our holding here that Sheriff Tate is not a final policymaker for Monroe County in the area of law enforcement, because Monroe County has no law enforcement authority, really is just another way of saying that when Sheriff Tate engages in law enforcement he is not about the business of county government. The sheriff in *Lucas,* in contrast, was about the business of county government in terminating a deputy. And the sheriff in *Parker* was about the business of county government when negligently hiring the jailer. The county and sheriff maintain county jails in partnership, and hiring a jailer falls on the local, administrative side of the sheriff's duties.

We drew this distinction between local, administrative duties and state duties in our post-*Parker* decision in *Owens v. Fulton County,* 877 F.2d 947. In *Owens,* we held that a Georgia district attorney acts for, and exercises the power of, the state rather than the county when making prosecutorial decisions. 877 F.2d at

951, 52. Citing *Parker,* we noted that an official simultaneously may exercise county authority over some matters and state authority over others. *Id.* at 952 (citing *Parker,* 862 F.2d at 1479). We found that a Georgia district attorney's relationship to the county involves merely budgetary and administrative matters. *Id. See also Parker,* 862 F.2d at 1478 ("The relationship between [the sheriff] and the county ... is central to the evaluation of whether the county can be liable for [his] actions.") Thus, we determined, a district attorney's acts with respect to budgetary and administrative matters—such as terminating an employee—may be exercises of county authority. But we held that the prosecution of state offenses is an exercise of state authority. *Owens,* 877 F.2d at 952.

B. *Whether Hearsay May Be Used to Defeat Summary Judgment*

In Count Three of his complaint, McMillian alleges that three officials—Sheriff Tate, Larry Ikner, an investigator in the prosecutor's office, and Simon Benson, an Alabama Bureau of Investigation agent—coerced prosecution witnesses into giving false testimony at McMillian's trial and thus knowingly used perjured testimony. The district court granted partial summary judgment to Tate, Ikner, and Benson on McMillian's claim that they coerced Bill Hooks and Joe Hightower into testifying falsely, holding that McMillian had failed to present sufficient evidence to raise a genuine issue of material fact as to whether Tate, Ikner, and Benson coerced Hooks and Hightower or knowingly used their perjured testimony. The district court held that McMillian could not create a genuine issue for trial with Hooks and Hightower's hearsay

statements to Alabama Bureau of Investigation agents because the statements would be inadmissible at trial. In the hearsay statements, Hooks and Hightower say that they were pressured to perjure themselves; now they say in sworn affidavits that they were not coerced and testified truthfully at trial.

McMillian contends that the district court erred in refusing to consider the hearsay evidence on summary judgment. He contends that the Supreme Court's decision in *Celotex* and our decisions in *Church of Scientology* and *Offshore Aviation* permit the use of hearsay to defeat a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Church of Scientology v. City of Clearwater,* 2 F.3d 1514 (11th Cir.1993), *cert. denied,* --- U.S. ----, 115 S.Ct. 54, 130 L.Ed.2d 13 (1994); *Offshore Aviation v. Transcon Lines, Inc.,* 831 F.2d 1013 (11th Cir.1987). Tate, Ikner, and Benson contend that the district court properly refused to consider the hearsay. Tate contends that McMillian misreads *Celotex.*

We do not read *Celotex* to permit McMillian to defeat summary judgment with the type of hearsay evidence offered in this case. In *Celotex,* the Supreme Court said:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

477 U.S. at 324, 106 S.Ct. at 2553. We read this statement as simply allowing *otherwise admissible* evidence to be submitted in

*inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form. *See Offshore Aviation,* 831 F.2d at 1017 (Edmondson, J., concurring).

McMillian does not contend that Hooks and Hightower's statements are admissible for their truth, that is, as substantive evidence that they were coerced into testifying falsely. Nor does McMillian contend that the content of the statements will be reduced to admissible form at trial. He contends that Hooks and Hightower *might* change their sworn affidavit testimony and admit to being coerced, but a suggestion that admissible evidence might be found in the future is not enough to defeat a motion for summary judgment. McMillian alternatively contends that he can use the statements to impeach Hooks and Hightower if they testify, consistently with their affidavits, that they were not coerced and did not testify falsely at McMillian's criminal trial. While the statements may be admissible for that purpose, the district court correctly noted that such impeachment evidence is not substantive evidence of the truth of the statements alleging coercion. Such potential impeachment evidence, therefore, may not be used to create a genuine issue of material fact for trial. Because Hooks and Hightower's statements will be admissible at trial only as impeachment evidence, the statements do not create a genuine issue of fact for trial.[7]

Neither *Church of Scientology* nor *Offshore Aviation* holds that

---

[7]McMillian also argues that there is other evidence that creates a genuine issue of fact for trial as to whether Tate, Ikner, and Benson coerced Hooks and Hightower into testifying falsely. We agree with the district court that the evidence is insufficient to raise a genuine issue for trial.

inadmissible hearsay may be used to defeat summary judgment when the hearsay will not be available in admissible form at trial. In *Church of Scientology,* we held that the district court should have considered newspaper articles offered as evidence that Clearwater's city commission conducted its legislative process with the intention of singling out the Church of Scientology for burdensome regulation. 2 F.3d at 1530-31. There was no argument that the events recounted in articles could not be proven with admissible evidence at trial, and we expressed no opinion as to whether the articles themselves would be admissible at trial. *Id.* at 1530-31 & n. 11. Indeed, there was every indication that witnesses would be able to testify at trial from their personal knowledge of the events recounted in the articles. Here, in contrast, McMillian points to no witness with personal knowledge who will testify at trial that Hooks and Hightower were coerced into testifying falsely.

In *Offshore Aviation,* we held that the district court should have considered a letter offered in opposition to a motion for summary judgment. 831 F.2d at 1015. The party moving for summary judgment argued for the first time on appeal that the letter was inadmissible hearsay. *Id.* We held that the objection to the letter's admissibility was untimely and that the district court should have considered the letter in its summary judgment decision. *Id.* at 1016. We also noted that the fact that the letter itself would be inadmissible at trial did "not undercut the existence of any material facts the letter may [have] put into question." *Id.* at 1015. Though we agree with McMillian that this and certain

other language in our opinion suggests that inadmissible hearsay may be used to defeat summary judgment, we do not read *Offshore Aviation* to hold that inadmissible hearsay may be used even when it cannot be reduced to admissible evidence at trial. There was no indication in *Offshore Aviation* that the letter could not be reduced to admissible evidence at trial. Indeed, that the letter at issue was based on the writer's personal knowledge, *id.* at 1016, indicates that there was no impediment to the writer testifying at trial as to the facts described in the letter.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

AFFIRMED.

PROPST, District Judge, concurring specially:

I concur in Judge Cox's well-reasoned opinion. I write separately only to address the opinion in *Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989).

I recognize that *Parker v. Williams* apparently holds that Alabama counties and sheriffs are "partners" in the operation of jails. I do not agree that Alabama law provides a reasonable basis for such a holding. I respectfully suggest that sheriffs and counties have independent obligations with reference to jails. The counties' sole responsibilities, under Alabama law, relate to the jail facilities.

I find no *Alabama* law which gives counties any authority to run or operate jails. Under Alabama law, the sole authority for "*running*" or *operating* jails and hiring jailors is placed with

sheriffs.  In my opinion, the mere fact that counties provide jail facilities and funds for salaries, etc. does not make them "partners" of the sheriff in the operation of jails. [1]  Counties have no more "control" over the "running" or operation of jails than they have over law enforcement by the sheriffs.  Sheriffs also "hire and train" law enforcement officers with county funds.  My full reasoning is addressed in *Turquitt v. Jefferson County,* --- F.Supp. ----, (N.D.Ala. Jan. 19, 1996).

---

[1]"Partnerships" generally involve agreements to share profits and losses.  I assume that the term "partner" in *Parker* was used in some analogous sense.  To the extent that payment of expenses and hiring and training of officers with county funds arguably makes the county a "partner," it would appear to be equally applicable to law enforcement activities.