**NATIONAL SPECIALTY INSURANCE COMPANY, Plaintiff–Appellee,**

**v.**

**Audrey MARTIN–VEGUE, individually and as Personal Representative of the Estate of Howard Martin–Vegue, Defendant–Appellant.**

**No. 14–15811**

**Non–Argument Calendar.**

United States Court of Appeals, Eleventh Circuit.

Feb. 25, 2016.

---

Anthony John Russo, Ryan Kent Hilton, Ezequiel Lugo, Ronald Steven Rawls, Butler Weihmuller Katz Craig, LLP, Tampa, FL, for Plaintiff–Appellee.

Benjamin C. Hassebrock, R. Hugh Lumpkin, Danya J. Pincavage, Ver Ploeg & Lumpkin, PA, Miami, FL, George E. Carr, Ver Ploeg & Lumpkin, PA, Orlando, FL, for Defendant–Appellant.

Before TJOFLAT, WILSON and JULIE CARNES, Circuit Judges.

PER CURIAM:

This appeal arises out of a declaratory judgment action that Plaintiff National Specialty Insurance Company ("Plaintiff" or "the insurance company") brought against Defendant Audrey Martin–Vegue to determine the applicability of an insurance policy in connection with a fatal trucking accident. The district court denied coverage under the policy at issue and granted summary judgment to Plaintiff. After careful review, we affirm.

## I. Background

On November 29, 2012, Andrii Plys was driving a tractor trailer carrying a load of Mexican beach pebbles from Gardena, California, to Delray Beach, Florida. During the trip, Plys collided with Howard Martin–Vegue's vehicle on Interstate 95 in Martin County, Florida, causing collisions with several other cars and resulting in Martin–Vegue's death. Defendant, Martin–Vegue's surviving spouse, filed a lawsuit in Florida state court against Plys and motor carrier ABS Transport, Inc.

("Transport").[1] Although the facts of the underlying accident are not in dispute for the purpose of this appeal, the parties dispute whether Plys was operating the tractor trailer on behalf of Transport or on behalf of another company with a similar name, ABS Freight Transportation, Inc. ("Freight"). Plaintiff insurance company issued insurance liability policies to both companies, and in fact Plaintiff has already paid the policy limits under Transport's insurance plan. Yet as explained more fully below, Defendant argues that she may recover under Freight's policy as well. In short, the Freight policy applies if Plys was driving on behalf of Freight. But if Plys was driving on behalf of Transport, then there is no coverage.

### A. The Relationship Between Freight and Transport

Freight and Transport were motor carriers with connections both to the accident and to each other. The individual owners of Freight and Transport used to be married to each other but were separated at the time of the November 2012 accident. Freight's owner is Nenad Bojkovski; Transport's owner was Kristina Mangarova until she dissolved the company. While married, the couple worked for Freight, but in March 2012, around the time Mangarova separated from her husband, she left Freight and created Transport.[2]

Freight then leased the trailer involved in the accident to Transport under an equipment lease agreement dated October 15, 2012. At the time of the accident, the tractor Plys was driving displayed Transport's name and U.S. Department of Transportation identification number.

Transport had leased the tractor from an independent trucking company called Deen, LLC. Under the lease agreement, Deen also provided one of its employees, the driver Plys, to drive the tractor for Transport. According to Plys, he never drove for Freight, although Freight owned the trailer he was pulling on the day of the crash. Thus, on the day of the November 29, 2012, accident, the tractor, trailer, and driver were all leased to Transport.

Making matters more complicated, even though the above indicates that Transport was the lessee of the trailer at the time of the accident, there is paperwork from before the accident showing that Freight agreed to carry the pebbles involved in the crash. One of the documents is a Confirmation of Contract Carrier Verbal Agreement ("Carrier Contract") between a dispatcher for Freight and a trucking broker named International Commodity Carriers Corporation ("ICCI"). ICCI links motor carriers like Freight and Transport with customers in need of someone to transport their goods. When a motor carrier begins working with ICCI, it must enter into a contract and confirm it has authority to operate as a motor carrier under federal regulations and has appropriate insurance. Dispatchers for motor carriers can then access postings showing loads available for truckers to haul. When a dispatcher wants to take a certain job, he calls ICCI and negotiates a rate for the shipment.

In this case, the ICCI Carrier Contract confirmed a verbal agreement for Freight to haul the pebbles from California to Florida. Freight's name and contact information are included on the document, so

---

**1.** Defendant filed suit on her own behalf and as the personal representative of her husband's estate.

**2.** Mangarova actually created a company under the name KM Freight in 2008 before

marrying Bojkovski, but the company was dormant until they separated in 2012, at which point the wife changed the company name to ABS Transport, Inc.

one may possibly infer that someone from Freight called ICCI to arrange transport of the pebbles.[3] The Carrier Pickup & Delivery Schedule ("Delivery Schedule"), another pre-haul document ICCI generated, similarly identifies Freight.

### B.  *Procedural Background*

Freight and Transport each held $1 million insurance policies issued by Plaintiff. After Defendant filed her state-court lawsuit against Transport and Plys, she entered into a settlement agreement under which she "fully and finally settle[d] and terminate[d] any and all past, present, or future" claims against Transport related to the accident.  As to Plys, she settled all claims "except to the extent that there is other liability insurance coverage available to [him]."  This settlement exhausted the $1 million limits of Transport's policy.

After the settlement, Plaintiff filed this declaratory action seeking a ruling that it owes no coverage under Freight's insurance policy because (1) Plys is not an insured under its terms and (2) the MCS–90 endorsement[4]—which guarantees a minimum level of coverage in the event Freight becomes liable but coverage is otherwise excluded under the policy's terms— does not apply.  The Freight policy defines "insureds" as follows:

a.  You for any covered "auto".

b.  Anyone else while using with your express or implied permission a covered "auto" you own, hire or borrow.  How-

ever, none of the following are "insureds" under this subparagraph:

. . . .

(8).  Anyone that is using an "auto" of yours under a written lease or trailer interchange agreement.

Plaintiff maintains that Plys falls under the exclusion found in subsection (8) because Plys was using a trailer that was leased to Transport at the time of the accident.

During discovery for this action, Defendant obtained the ICCI pre-haul documents bearing Freight's information. Now contending that Freight, not Transport, was the actual motor carrier responsible for the accident, Defendant amended her complaint in the Florida suit to add it as a defendant.  And because Defendant's settlement agreement with Plys allows her to sue him based on any other liability insurance he has, Defendant seeks additional recovery from Plys under the Freight liability policy, arguing that he was using the trailer on Freight's behalf, and not pursuant to a written lease agreement with Transport.

To resolve this coverage issue, the parties filed cross-motions for summary judgment in this action.  The district court granted summary judgment to Plaintiff, the insurance company in this action. Based on the record evidence, the court concluded that "Transport, not Freight, was the motor carrier for-hire at the time

---

**3.**  The Carrier Contract identifies the dispatcher who entered into the verbal agreement with ICCI. His e-mail address bears the domain name "@abstransport.com." Confusingly, employees of both Freight and Transport used that domain name.  Defendant argues that the document on its face is evidence that the dispatcher must have worked for Freight. Yet Mangarova testified that the dispatcher worked on behalf of Transport only, and Bojkovski denies Freight ever employed him. Ultimately, for the reasons discussed *infra*, we

find that the Carrier Contract and the employer of the dispatcher are not material to our ultimate inquiry of who hauled the goods.

**4.**  An MCS–90 endorsement is an endorsement added to a trucker's insurance policy to satisfy federal motor-carrier regulations requiring minimum levels of financial responsibility. *See* 49 U.S.C. § 31139(b); 49 C.F.R. § 387.15.

of the accident." Thus, because Plys was operating the leased trailer on behalf of Transport, the court found that Plys is not an insured under subparagraph (8) of the Freight policy's exclusions. In addition, the court reasoned that the MCS–90 endorsement is inapplicable because Freight was not the for-hire motor carrier.

Defendant argues on appeal that the district court erred in denying coverage because there are factual disputes about (1) Plys's status as an insured under the Freight policy and (2) whether the MCS–90 endorsement applies to the accident.

## II. Standard of Review

"We review a district court's grant or denial of summary judgment *de novo*, considering all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

## III. Discussion

We first examine whether the district court erred in finding as a matter of law that Plys is not an insured under the Freight policy. Then we decide if any other coverage is available under Freight's MCS–90 endorsement.

### A. *Coverage of Plys under the Freight Insurance Policy*

Again, in the section of the Freight policy defining the insureds, "[a]nyone that is using an 'auto' of yours under a written lease or trailer interchange agreement" is denied coverage. An "auto" includes a trailer or semitrailer. The parties agree that Illinois law governs the Freight policy, and Illinois courts require that the unambiguous terms of insurance policies be given their plain, ordinary, and popular meaning. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill. Dec. 691, 607 N.E.2d 1204, 1212 (1992).

In deciding whether Plys was using the trailer under a written lease, we look not only to whether a written lease existed, but also to whether Plys was in fact using the trailer on behalf of Transport. First, there is no genuine dispute that a written lease existed. Defendant contends there is evidence that the October 15, 2012 agreement was in fact created after the November 29, 2012 accident. She suggests that Bojkovski had an incentive to shift responsibility from Freight to Transport to prevent the accident from adding to his company's already poor driving record. As evidence that the lease was created after the November 2012 accident, Defendant notes that Mangarova signed the lease on Transport's behalf using the last name "Mangarova," not "Bojkovski." Defendant argues that Mangarova was still married to Bojkovski when the lease was purportedly executed, so the fact that she signed the name "Mangarova" means that the agreement was manufactured sometime after the couple's divorce following the November accident.

We are unpersuaded. Mangarova testified that she usually signed documents using her own last name even while married, and besides, she and Bojkovski were already separated when she signed the

agreement. Furthermore, Defendant's claim that Mangarova's signature on the lease does not conform to her signature on other documents is unfounded. Mangarova's signature on the lease appears to match the one on her affidavit filed in this litigation. There is no evidence the signature is forged, and a jury could not reasonably infer from these arguments that Mangarova created the equipment lease after the November accident. As a result, the undisputed evidence demonstrates that a written lease for the trailer existed when Plys caused the accident.

The undisputed evidence also shows that Plys was using the trailer under the written lease, as required by the exclusion. First, and contrary to Defendant's argument, the Carrier Contract is not evidence that Freight was the motor carrier. For one thing, a representative from ICCI confirmed that sometimes a company contracts to haul a load even though another company ends up as the carrier. This practice—"double broking," as ICCI called it in the Carrier Contract—voids the initial contract. So, if the contracting carrier performs as agreed, ICCI pays upon receipt of an invoice and a bill of lading. But if another carrier hauls the load, ICCI would pay the actual carrier as long as that carrier has authority to haul under federal regulations, carries sufficient insurance, and produces the signed bill of lading showing it in fact transported the goods. Therefore, that Freight entered into the

Carrier Contract does not determine who actually hauled the goods.

And here, all the evidence concerning the identity of the transporter of the pebbles points to Transport. Defendant does not dispute that Transport leased both the tractor and driver involved in the accident. As explained above, Transport also leased the trailer. Mangarova and Plys testified that the latter worked exclusively for Transport; Bojkovski confirmed that Freight never employed him. In fact, the tractor Plys drove displayed Transport's name and DOT number. There is no dispute that Transport had authority to haul as a motor carrier and carried sufficient insurance. Plys even signed the bill of lading for the goods. Transport thus fulfilled ICCI's requirements for payment.[5] Defendant fails to contradict any of this evidence.[6]

We further find that the district court did not improperly credit Bojkovski and Mangarova's testimony. Defendant accuses them of altering a copy of the ICCI Delivery Schedule to remove Freight's identifying information and to conceal its involvement in the accident.[7] Given this accusation, she asserts that Bojkovski and Mangarova's testimony is unreliable, and so a jury must determine their credibility. Offering evidence for impeachment purposes, however, cannot create a genuine issue of fact at the summary judgment stage. *See McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996) (holding that

---

**5.** For what it's worth, which appears to be little, nobody has attempted to claim payment for the load of pebbles. ·

**6.** Defendant takes issue with the district court's failure to consider an expert witness who opined that Freight was the motor carrier for the goods. That expert looked at the ICCI documents and concluded that Freight was assigned the load and was therefore the motor carrier. But as explained, we agree with the district court that the pre-haul documents do not create a genuine issue for trial because all the evidence shows that Transport was the actual carrier on the day of the accident, whether or not Freight entered into a Carrier Contract.

**7.** At some point, Transport supplied Plaintiff with a copy of the Delivery Schedule that omitted references to Freight. Still, nobody disputes that the accurate version of the Delivery Schedule from ICCI names Freight.

impeachment evidence is not substantive and "may not be used to create a genuine issue of material fact for trial"). Setting aside Defendant's credibility arguments (upon which she relies heavily), there is no substantive evidence that Plys was hauling the goods for Freight when he caused the fatal accident.

In sum, the undisputed evidence demonstrates that Plys was using the trailer under a written lease, on behalf of Transport, at the time of the accident. Consequently, based on the plain terms of the Freight policy's exclusions, Plys is not an insured.

### B. *Applicability of the Freight Policy's MCS–90 Endorsement*

The second issue on appeal is whether, notwithstanding the exclusion of coverage under the Freight policy's terms, the MCS–90 endorsement applies to the underlying accident to guarantee a minimum level of coverage. The Motor Carrier Act of 1980 ("MCA"), in addition to deregulating the trucking industry and reducing barriers to entry, addressed safety issues and financial responsibility for trucking accidents. *See Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 873 (10th Cir.2009). In particular, Congress addressed "the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. Co. v. Distribution Servs., Inc.*, 320 F.3d 488, 489 (4th Cir.2003). To that end, the MCA imposes a minimum insurance requirement on each motor carrier registered to engage in interstate commerce. *Id.; see also* 49 U.S.C. § 31139(b) (stating that the MCA's minimum financial obligations apply to "motor carriers"). Motor carriers transporting non-hazardous property must demonstrate financial responsibility of at least $750,000. 49 C.F.R. § 387.9. They must further establish proof of that responsibility in one of three ways: "(1) by an MCS–90 endorsement, (2) by a surety bond, or (3) by self-insurance." *Yeates,* 584 F.3d at 874; *see also* 49 C.F.R. § 387.7(d)(1)-(3).

The regulations implementing the MCA provide the specific forms required to establish proof of financial responsibility, including the MCS–90 endorsement relevant to this case. That endorsement provides, in part:

> In consideration of the premium stated in the policy to which this endorsement is attached, *the insurer (the company) agrees to pay*, within the limits of liability described herein, *any final judgment recovered against the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of sections 29 and 30 of the Motor Carrier Act of 1980 *regardless of whether or not each motor vehicle is specifically described in the policy* and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

49 C.F.R. § 387.15 (emphasis added).

Federal law controls the interpretation and operation of the MCS–90. *Distribution Servs.*, 320 F.3d at 492. While the Eleventh Circuit has not extensively analyzed this endorsement, a majority of courts treat "the insurer's obligation under the MCS–90 endorsement as one of a surety." *Yeates,* 584 F.3d at 878 (collecting cases). In that regard, this obligation is triggered only when:

> (1) the underlying insurance policy (to which the endorsement is attached) does not provide liability coverage for the accident, and (2) the carrier's other insurance coverage is either insufficient to

meet the federally-mandated minimums or non-existent.

*Id.* at 879; *see also T.H.E. Ins. Co. v. Larsen Intermodal Servs., Inc.,* 242 F.3d 667, 672 (5th Cir.2001) (explaining that "the insurer's obligations under the MCS–90 are triggered when the policy to which it is attached provides no coverage to the insured"). If a motor carrier's insurance pays a judgment satisfying the regulatory minimum, the goal of public financial responsibility has been accomplished and the endorsement does not apply. *See id.*

▪ Here, Defendant argues that the endorsement guarantees payment of a judgment of up to $1 million against Freight, even if coverage is excluded under the terms of the policy, because Freight was the for-hire motor carrier of the load of pebbles.[8] Federal regulations define a for-hire motor carrier as a carrier in "the business of transporting, for compensation, the goods or property of another." 49 C.F.R. § 387.5. So, to decide if Freight's MCS–90 endorsement could possibly apply here, the relevant question is whether Freight was the for-hire motor carrier for the pebbles at the time of the accident.[9]

As we already discussed, there is no genuine dispute that Plys was hauling the pebbles on behalf of Transport. Although Defendant contends that Freight was the for-hire motor carrier if it was entitled to payment for the haul, Transport fulfilled ICCI's requirements for payment. Transport had authority to haul as a motor carrier and carried sufficient insurance. Plys, who always drove on behalf of Transport, also signed the bill of lading for the goods. There is thus no colorable evidence Freight was the for-hire motor carrier engaged in "the business of transporting, for compensation, the goods or property of another" when Plys caused the fatal accident.[10] *Id.* Instead, all the evidence shows Plys was driving for Transport. Because Transport was therefore the motor carrier for hire, not Freight, the district court properly ruled

---

8. The parties do not dispute that the MCS–90 would satisfy a judgment against only the policy's named insured—in this case, Freight. *See, e.g., Ooida Risk Retention Grp., Inc. v. Williams,* 579 F.3d 469, 477–78 (5th Cir. 2009) (explaining that federal regulations define the "insured" as "the motor carrier *named* in the policy of insurance, surety bond, [or] endorsement" (emphasis in original) (quoting 49 C.F.R. § 387.5)); *Armstrong v. U.S. Fire Ins. Co.,* 606 F.Supp.2d 794, 823–26 (E.D.Tenn.2009) (concluding "that the only sensible reading and interpretation of the MCS–90 is that 'the insured' is the named insured").

9. The parties agree that the time of the accident is the relevant focal point in deciding Freight's status—and thus whether it was subject to the MCA's financial responsibility requirements. Other courts agree that it is proper to "determine[ ] the MCS–90's applicability with reference to time of the loss." *Canal Ins. Co. v. Coleman,* 625 F.3d 244, 250–51 (5th Cir.2010) (collecting cases). For that reason, whether Freight initially entered into the Carrier Contract is not relevant to the applicability of the MCS–90.

10. We also find no evidence of a joint venture between Freight and Transport under the laws of Illinois (where both companies were based). We agree with the district court that Defendant fails to produce evidence of many of the elements of a joint venture, including an agreement to carry on a joint enterprise, joint control over the enterprise, and the sharing of profits and losses. *See Yokel v. Hite,* 348 Ill.App.3d 703, 284 Ill.Dec. 155, 809 N.E.2d 721, 727 (2004) (stating that the criteria for a joint venture are: "(1) an express or implied agreement to carry on a joint enterprise, (2) a manifestation of that intent by the parties, (3) a joint proprietary interest, as demonstrated by the contribution of property, finances, effort, skill, or knowledge by each party to the joint venture, (4) some degree of joint control over the enterprise, and (5) a provision for the parties to share in both the profits and the losses of the enterprise").

that Freight's MCS–90 endorsement is not implicated.[11]

## IV. Conclusion

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of Plaintiff.

**AFFIRMED.**

---

11. Plaintiff made several other arguments about why the MCS–90 should not apply here even if Freight were the for-hire motor carri-er. Given our ruling above, we need not address Plaintiff's alternative arguments.