Sharon MAGILL, Plaintiff,

v.

LEE COUNTY, et al., Defendants.

Sherrer HUDMON, Plaintiff,

v.

LEE COUNTY, et al., Defendants.

Civil Action Nos. 96–A–
1140–E, 97–A–25–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Jan. 20, 1998.

Jeffrey Bennitt, Robyn Bufford, Birmingham, AL, for plaintiffs.

Kendrick Webb, Kelly Davidson, Montgomery, AL, for defendants.

### MEMORANDUM OPINION

ALBRITTON, Chief Judge.

This matter is before the court on two motions for summary judgment. Defendant Sheriff Chapman filed a motion for summary judgment on November 10, 1997. Likewise, Defendant Lee County filed a separate motion for summary judgment on the same day. The parties have filed appropriate responses and replies and the motions are properly before the court for its consideration. For the reasons discussed herein, summary judgment is due to be GRANTED.

### I. STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to. the non-movant's case exists. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989).

### II. FACTS

This is a strip-search case. Everyone who is put into a cell at the Lee County Jail is strip-searched first. Both sides have offered documents, as well as testimony of jail officials, about this official policy. In addition, testimony of the Plaintiffs themselves has been offered concerning their experience of being searched. As is required when addressing summary judgment, the court has viewed the evidence in the light most favorable to the non-movant, Plaintiffs Magill and Hudmon.

*The Jail's Policy.*

Both sides draw upon the same testimony and evidence to establish the official policy of

the Lee County Jail regarding strip searches. Pursuant to Security Policy 7.05, adopted by the Lee County Sheriff on July 7, 1993, everyone who is put into a cell at the Lee County Jail is strip-searched. *Lee County Jail Security Policy 7.05.* The policy defines "strip searches" as searches "during which an inmate is required to remove his clothing." *Id.* The policy also sets the times at which strip searches are conducted, which include "[a]fter an inmate who is housed in the facility is booked, unless prohibited by law." *Id.* The policy further requires that the search be done by "an officer of the same sex as the inmate" and that the search be "done in a manner that avoids unnecessary force, embarrassment, or indignity to the inmate." *Id.* The searches are done in the interest of "facility safety and security." *Id.*

Sheriff Chapman has testified that he is responsible for the search policy in question. *Chapman Depo. 4:22–5:9.* He does not seek warrants to do these searches because he "believe[s] the law gives the sheriff the authority to check people that are coming in and out of a correctional facility for security purposes and contraband." *Id. at 11:10–21.* Chapman defines a strip search as one which does not include stripping the inmate down to nakedness:

> Q. What is the definition of a strip search?
>
> A. Definition of a strip search is to strip the outer garments. Keep your hands off of the body parts. If it's female, you do not make them take their brassiere off or their panties....
>
> Q. And that's your policy?
>
> A. That's the policy.

*Id. at 14:1–11.* Chapman goes on to specifically say that the policy only includes removing the outer clothes, and that if an officer told an inmate to remove her underwear, that officer would be "on [her] own if [she] d[id] that." *Id. at 15:3–7.*

The searches are done in a small room just off of the booking area, which has a long, thin window located in the door. Searches were done in this certain room with the knowledge and approval of the Sheriff. *Id. at 8:8–11.* Sheriff Chapman says that there was no decision to put the window in the room, only that the facility was built that way when he became Sheriff. *Id. at 17:21–23.* Officers try to block anyone from seeing in the window when they do searches, by standing in front of it; it is, in fact, difficult for any person to peer through the window without standing "right up against it." *Id. at 17:1–20.*

Chief Deputy Cary Torbert, Jr. is the administrator of the Lee County Jail. *Torbert Affid.* He testified that the "limited strip search" is only performed on those "who actually enter a jail cell," and is not performed on persons "who have already obtained a bond for their release prior to their booking," or who are in the process of obtaining a bond. *Id.* The Chief Deputy says that the inmates are required to remove "only their outer clothing and their shoes and socks." *Id.*[1] Torbert testified that any officer who ever told an inmate to remove anything other than their outer clothing would be "acting directly contrary to jail policy and would be disciplined appropriately, if not terminated." *Id.* The searching officer is told to block the window when conducting the search, and a jail officer is always on duty in the control room and could prohibit observation of the search. *Id.*

Chief Deputy Torbert says that the policy was instituted to prevent the introduction of small contraband into the jail, such as drugs or weapons. *Id.* Torbert testified that the crime with which the inmate is charged is not a reliable indicator of the propensity to introduce contraband. *Id.* Rather, it is those addicted to drugs (not necessarily those charged with drug offenses) who may try to introduce that contraband. *Id.* In addition, it is "often first time offenders or weaker of-

---

1. Torbert testified that an inmate is only required to remove her underwear when there is a reasonable suspicion for a body cavity search. *Id.*

Torbert further testified that, to his knowledge, there has not been a body cavity search at the Lee County Jail. *Id.*

fenders, which [sic] have heard horror stories of inmate violence, who will try to smuggle in a weapon." *Id.* Once the contraband is inside the jail, it poses a threat to other inmates, as well as the inmate herself. *Id.* Torbert says that the decision to search those who are placed in holding cells was made because they pose threats to themselves and other inmates in holding cells, and have contact with other inmates making it possible to introduce contraband into the general population. *Id.*

Testimony from employees of the Sheriffs Department verified the Sheriff's and Torbert's interpretations of the policy. Officer Glines testified that people who are taken into a cell are strip searched. *Glines Depo. 40:23—41:4; 22:1–13.* She further testified that when inmates are searched, they are put in a room that has an approximately 4 inch × 36 inch window in the door, which could make it possible for persons to see into the room. *Id. at 41:10—43:1.* Glines testified that she was trained to block the window with her back when conducting a strip search. *Id. at 43:2–14.* Ms. Reasor testified that she checks to make sure that the officer's back is at the window to verify that nothing is wrong. *Id. at 33:14–19.* Ms. Reasor was taught and believed that the process of strip-searching only includes removing someone's outer clothes. *Id. at 33:23—34:10.*

### The Strip-searches of the Plaintiffs.

There are two plaintiffs in this case. Both were strip-searched prior to being placed in a cell at the Lee County Jail.

Sharon Magill was strip-searched, down to her underwear, after being arrested for driving under the influence. Her description of the process echoes the testimony of the Lee County officials. When Ms. Magill was searched, the officer never asked her to take off her undergarments. *Magill Depo. 30:3–17.* In addition, the search was conducted by a female officer with no one else in the room. *Id. at 31:9–12.* Magill asked the officer why she was undressing before a window and the officer moved in front of the window, but, according to Ms. Magill, did not completely block it. *Id. at 31:13–22.* The window was clear with metal wire in it. *Id. at 33:13–16.* In any event, however, Ms. Magill does not think that anyone came to the window. *35:3–6.* Ms. Magill was offended because the officer could see through her undergarments. *Id. at 38:4–16.*[2] She testified that she was upset and crying throughout the entire process. *Id. 24:3–5.*

Sherrer Hudmon was strip-searched when she was placed into a cell while her husband searched for someone to bond her release on bad-check charges. She testified that she stripped down naked when told to take off her clothes. *S. Hudmon Depo. 65:9–15.* Ms. Hudmon described the process after she took off her clothes: the female officer

> told me to pull up my hair. She told me to shake my head. She told me to open my mouth. She told me to turn around. She told me to bend over. Then she told me I could put on my clothes.

*Id. 67:2–6.* No one else entered the room except for the female officer, and Ms. Hudmon was fully dressed before leaving the room. *Id. at 67:13–19.*[3] Ms. Hudmon did not see anyone else peer into the room. *Id. at 72:16—73:4.* Ms. Hudmon was upset, crying, and "scared to death" during the entire seven-eight hours she spent at the jail, particularly after she was searched. *Id. at 73:7—74:8.*[4]

### III.   DISCUSSION

The court's discussion and decision in this case are affected by the status of the Defen-

---

**2.** There are also some allegations that the officer put on a latex glove. *Magill Depo. 30:3–8.* For what purpose, is not known. The glove was never used, however, so those allegations are meaningless.

**3.** Ms. Hudmon was also apparently upset by the search because she thought the officer appeared to be a lesbian. *Hudmon Depo. 93:14—95:11.* Since the Plaintiff has not linked this testimony

in any way to an official policy or custom of the Sheriff, it is not necessary for the court to consider it.

**4.** Officer Reasor stated that one of the inmate/plaintiffs here "probably was strip searched" if she was in the jail "for any kind of length of time," but not "if she bonded out as soon as she got there." *Reasor Depo. 12:21—13:11.*

dants and Plaintiffs before it. The court is called upon to determine only one issue: whether the strip search policy of the Lee County Jail is constitutional. The court determines that it is; thus, summary judgment for the Defendants is due to be GRANTED.

### Preliminary Note.

■ The only defendants who remain in this case are the Sheriff and Lee County, and the sole remaining claim against them is a 42 U.S.C. § 1983 claim for deprivation of the Plaintiff's Fourth Amendment rights against unreasonable searches, as applied to the states via the Fourteenth Amendment. Section 1983 is not a source of federal rights. Rather, it is merely a means for vindicating constitutional and statutory rights, a means for an injured party to sue state officials who infringe upon those rights. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In any § 1983 lawsuit, the plaintiff must initially show that she was "deprived ... of a right secured under the Constitution or federal law" in order to recover. *Willis v. University Health Services, Inc.*, 993 F.2d 837, 840 (11th Cir.1993), cert.

den. 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 420 (1993).[5] In this case the issue is whether the Sheriff of Lee County violated these plaintiffs' Fourth Amendment rights in strip-searching them upon entry in the Lee County Jail.[6] The reasonableness of the search and its constitutionality are to be decided by the court as a question of law. *Justice v. City of Peachtree City*, 961 F.2d 188, 193 (11th Cir.1992); *O'Neal v. DeKalb County, Ga.*, 850 F.2d 653, 657 n. 6 (1988), citing *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

■ In determining the constitutionality of the searches in this case, the court's job is made easier by the status of the Defendants. There is, of course, no respondeat superior liability under § 1983. *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir.1993), cert. den., 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). The Defendants sued here are not alleged to have personally participated in the searches; as a result, they could only be held liable if the searches were

---

**5.** Plaintiff must also show that Defendants acted under color of state law. Here, that issue is not contested.

**6.** In this court's *Memorandum Opinion & Order, May 20, 1997* (denying Defendant's Motion to Dismiss), the court declined to analyze Plaintiff's claims under any other Constitutional provision. The Eighth Amendment clearly does not apply. *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law"). If the court were to analyze this challenge under the Eighth Amendment, it would be easy to dispose of. Under that analysis, the federal courts do not intervene unless the "strip searches ... are devoid of penological merit and imposed simply to inflict pain." *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir.1995) (granting summary judgment to defendant where policy was to "strip search all 'close management' prisoners ... before they leave their cells for any reason," and plaintiff had not presented any evidence to show policy was unreasonable or that searches were done for retaliatory reason), citing *Turner v. Safley*, 482 U.S. 78, 83–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Although it is less clear that the due process clause does not apply, the court likewise declined to consider that theory. The Supreme Court has said that "[w]here the State seeks to impose punishment [prior to an adjudication of guilt], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.* 430 U.S. at 671–72 n. 40. Plaintiffs have not alleged that the strip searches here were done for the purpose of punishment, however, nor have they alleged that life, liberty or property were implicated by the searches. *Bell* may, in fact, stand for the proposition that strip / body cavity searches performed after an inmate has contact with visitors do not implicate due process. *Bell*, 441 U.S. at 560–61 ("Nor do we think that the [searches, among other restrictions] constitute 'punishment' in violation of the rights of pretrial detainees under the Due Process Clause of the Fifth Amendment"). Any substantive due process rights that may be at issue would probably only be redundant of the rights guaranteed by the more specific text of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989). At least, plaintiffs have not identified how they would be different, so they will not be considered.

unlawful and were taken pursuant to their official policy or custom. *Monell*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir.1996).[7] Since neither side has presented evidence that the Defendants condoned violations of the policy, *see Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), cert. den. 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991), the court must look only to the official policy of the Lee County Jail and determine if that violates the Constitution.

### The Fourth Amendment Rights of Pre-trial Detainees.

■ In determining the constitutionality of the searches at issue, the court must be mindful not only of the status of the Defendants in this case, but also the status of the Plaintiffs. Plaintiffs have challenged searches which were performed on them while they were inmates at the Lee County Jail. Determining whether there is a constitutional violation of the rights of someone confined in a jail, even as a pre-trial detainee, is different from determining whether the rights of an unincarcerated individual have been violated. *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Pre-trial detainees do not forfeit all of their constitutional rights at the jailhouse door. *Id.* at 545. Nevertheless, pre-trial detainees "simply do[] not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546. Rather, a detainee's rights must be balanced against "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution." *Id.*

■ The court's job in this type of case is to seek a "mutual accommodation" between the detainee's rights and the restrictions of jail. *Id.* All restrictions on inmate rights "must be evaluated in light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547. Practices which prison officials think are needed to preserve order and security "should be accorded wide-ranging deference." *Id.*

### Strip-searches of Pre-trial Detainees-the Legal Standard.

In this court's decision not to dismiss this case, the court carefully canvassed Eleventh Circuit law on the issue of strip-searches. The court concluded that the law was somewhat undeveloped: "The court agrees with the limited proposition that *Bell* and *Peachtree City* [*Justice v. City of Peachtree City*, 961 F.2d 188 (11th Cir.1992)] do not clearly establish [all] the law concerning when a

7. It goes without saying that the Defendants could only be held liable for an official policy or custom which is *their* official policy or custom. The Sheriff has admitted that he is responsible for the search policy. The County contends that it is not liable for his search policy, since the County exerts no control or supervision over the Sheriff, and is not responsible for the management of the jail and its policies.

There is a live debate whether an Alabama county may be held liable for the actions of the Sheriff as jailer. The Supreme Court recently decided that the county is not liable for the actions of the Sheriff when he is acting as a state official, such as when he is investigating crime. *McMillian v. Monroe County, Ala.,* — U.S. —, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). That decision left open whether there are situations where the Sheriff may be viewed as a county official, (indeed maybe even a county policymaker), and the county would be liable for his actions. There is Eleventh Circuit authority for the

proposition that the county may be liable for the Sheriff's personnel policies or decisions. *Parker v. Williams*, 862 F.2d 1471 (11th Cir.1989). Although that decision may not bind this court to a decision that the county would be liable for the Sheriff's custodial and security policies, it could be persuasive.

In any event, *Parker* has come under great scrutiny because of a well-reasoned opinion by Judge Propst of the Northern District of Alabama. *Turquitt v. Jefferson County, Ala.,* 929 F.Supp. 1451 (N.D.Ala.1996). Judge Propst pointed out that later decisions of the Eleventh Circuit, decisions of the Alabama Supreme Court, and *Parker*'s own interpretations of state law, make *Parker* a questionable decision. Judge Propst certified an appeal to the Eleventh Circuit. *Id.* at 1455. *See also McMillian v. Johnson*, 88 F.3d 1573, 1585 (11th Cir.1996) (Propst, concurring specially). The Eleventh Circuit granted that appeal, and has agreed to hear the case en banc. *Turquitt v. Jefferson County, Ala.,* 102 F.3d 465 (11th Cir.1996).

strip-search of a lawfully detained adult violates the Fourth Amendment." *Memorandum Opin. & Order at 15 (denying motion for dismissal), May 20, 1997.* The court did. say, however, that one proposition is clear, indeed clear enough to be a basis to deny qualified immunity. That proposition is that "strip-searches of pretrial detainees must be based on legitimate objective concerns." *Id.* at 17–18.

■ In other words, the government must establish some justification for undertaking a search. The test is somewhat of a balancing test: "the more intrusive a search is upon personal rights, the more the government must demonstrate justification for conducting the search." *Peachtree City,* 961 F.2d at 192. As stated by the Supreme Court in *Bell:*

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell,* 441 U.S. at 559, citing *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

The "law" regarding strip-searches is, therefore, a balancing act. It tells the court not so much *what* the decision in this case should be, but *how* the court should consider the matter. The court is supposed to balance the legitimate institutional concerns of security and safety of the Lee County Jail, against the rights of the Plaintiffs, pre-trial detainees. In balancing these competing interests, the court should look to the scope, manner, justification, and place of the search in question.

### Strip-searches of Pre-trial Detainees-the Precedent.

The "law" leaves room for a rather open analysis centered around four factors. More enlightening to the ultimate resolution of this particular case are the precedents. Both *Bell,* the Supreme Court law on this issue, and *Peachtree City,* the Eleventh Circuit precedent, sustain strip-searches in similar contexts.

*Bell* concerned searches done on pre-trial detainees at a federal facility, which are actually more intrusive than the present searches. 441 U.S. at 524. Inmates at the facility, just like inmates at all federal prison facilities, were "required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Id.* at 558. The purpose of the strip / body cavity search was "not only to discover but also to deter the smuggling of weapons, drugs, and other contraband." *Id.*

In determining the precise "question whether visual body-cavity inspections as contemplated by the [jail] rules can *ever* be conducted on less than probable cause," the Supreme Court was careful not to "underestimate the degree to which these searches may invade the personal privacy of inmates." *Id.* at 560. Nevertheless, the Court in its "[b]alancing [of] the significant and legitimate security interests of the institution against the privacy interests of the inmates," concluded that those searches could be done. *Id.* Particularly important to the Court were the unique and "serious security dangers" posed in jails. *Id.* at 559. The "[s]muggling of money, drugs, weapons and other contraband" was observed to be "all too common an occurrence." *Id.* The Court viewed the propensity of inmates to smuggle as a given-the fact that contraband had been found on only one inmate was viewed as a "testament to the effectiveness of this search technique as a

deterrent," instead of a testament to the uselessness of the search. *Id.*

The Eleventh Circuit has also shed light on the issue of strip-searching pretrial detainees. *Justice v. City of Peachtree City*, 961 F.2d 188 (11th Cir.1992) involved a Lee County-type strip search ("down to her panties") of a female juvenile who was not even going to be put in a cell, but released to her parents upon arrival at the police station. *Id.* at 189–90.[8] The Eleventh Circuit noted that strip searches are indeed "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Id.* at 192. In addition, the court noted that it was given particular pause when the strip search was "of a juvenile [and] based on less than probable cause." *Id.* at 193. Nevertheless, the court upheld the search of the juvenile arrestee:

> Consequently, we hold that law enforcement officers may conduct a strip search of a juvenile in custody, even for a minor offense, based upon reasonable suspicion to believe that the juvenile is concealing weapons or contraband.

*Id. Peachtree City* is not the most instructive case, given that it involves the strip-search of a minor who is not even going to be placed in a cell. Nevertheless, the Eleventh Circuit's sustaining of that search, as well as the Supreme Court's sustaining of the search in *Bell*, put the complaints of Ms. Magill and Ms. Hudmon in a certain difficult position.[9]

### Analysis of the Lee County Searches.

■ Analyzing the Lee County searches under the *Bell* factors, and in light of the decisions in *Bell* and *Peachtree City*, this court has little difficulty sustaining the constitutionality of the searches. The Lee County Sheriff has undertaken only to conduct a limited strip search on all newly-incarcerated persons at the Jail, only those who will be placed in a cell. Furthermore, the Sheriff is conducting this search in a reasonable and justified manner, and in a reasonable place.

■ *Justification for the Searches.* The searches performed on newly-incarcerated persons at the Lee County Jail are certainly justified. The jailers have a difficult job to do: to protect their inmates from themselves, to protect other inmates, and to protect their officers, all the while maintaining order and an environment appropriate for rehabilitation.[10] As noted by the Eleventh Circuit in *Peachtree City*, "strip searches are valuable law enforcement tools in maintaining security." *Id.* at 193. This court does not underestimate the need for Lee County to provide a secure institution, and further, does not underestimate the dangers that contraband, such as drugs and weapons pose.

The newly-admitted detainees in this case are in a similar position to the inmates in *Bell*. Neither is yet convicted of a crime, but both are entering (or re-entering) a prison institution after contact with the public. If

8. This court relied on this case, in large part, in reaching its conclusion at the dismissal stage that the law is clearly established that the state must have a legitimate, objective basis for doing a strip search. *Id.* at 192 ("The *Bell* balancing test for reasonableness requires 'at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test.' ").

9. Even if the court were not to hold that these searches are reasonable as a matter of law, the court would be receptive to Defendant Chapman's arguments that he is entitled to qualified immunity for the claims against him in his individual capacity (the only claims which remain against the Sheriff). Indeed, the facts in this instance could lead the court to the conclusion

that qualified immunity is appropriate. *See Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) ("For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*."). Questions about the Sheriff's qualified immunity need not be decided, however, since the court may decide as a matter of law that the actions do not violate the constitution.

10. The Lee County Jail not only holds pre-trial detainees, but also those convicted of misdemeanors.

**1390**

the searches in *Bell* are justified, the searches in this action are justified as well. Furthermore, the detainees in this case are in a position to pose greater danger to the institution than was the detainee in *Peachtree City*. There, the juvenile was not even going to be placed into contact with the inmate population, yet the search was sustained. Rather, the juvenile was going to be released to her parent after arriving at the jail; there was no threat to the security of the institution.

Plaintiffs have asked this court to hold the searches unconstitutional because the Defendants had no probable cause or reasonable suspicion for the search. In *Peachtree City*, the Eleventh Circuit appears to place some emphasis on the idea that the officer had "reasonable suspicion" for the search. *Id.* at 193–94. It is not certain from a fair reading of the opinion whether this requirement is present only because the case involved a juvenile arrestee. Indeed, given that the juvenile in that case was not going to be placed in a cell, *Peachtree* is not exactly persuasive authority on this issue.

In any event, however, this court will not read the Eleventh Circuit's decision to require that some heightened justification be present for a jail official to search a new inmate before they are placed in lockup with other prisoners. In *Peachtree City*, the Eleventh Circuit noted that for institutions, the "security dangers" would be "the same whether the detainee is a juvenile or an adult." *Id.* at 193. This court would analogously note that the security dangers posed to the Lee County Jail are as high for one inmate as for another, no matter the crime they are charged with. Even those who are only placed in a holding cell could pose dangers to themselves, other inmates, and the guards. Furthermore, they have contact with other general population inmates. In addition, the officers have testified, in an uncontested manner, that the inmates who might at first glance appear to pose the least threat may in fact pose the greatest because of their fear and potential threat to themselves. Searches of all newly-admitted detainees who are going to be locked-up, and in contact with other prisoners, are justified.

■ *Scope of the Searches.* The searches in the present case are reasonable in scope as well. The Lee County policy requires all newly admitted detainees to remove all of their outer clothing, and only their outer clothing. This is a reasonable response given that small objects, such as pills, needles, or other contraband, can pose difficult and dangerous situations for jail administrators. Ms. Hudmon testified, of course, that she removed all of her clothing including her underwear. Nevertheless, she could in no way link this to an official policy or custom of the jail. Indeed, in her testimony she even appeared confused about the instructions that she was given by the officer.[11] In any case, however, the court is not basing its opinion on the Sheriff's decision to allow the inmates to keep on their underwear. The constitutional balancing of the inmate's rights and jail's concerns does not necessarily turn on the issue of whether the inmates are allowed to wear a bra and panties.

■ *Manner of the Searches.* The searches at issue are also reasonable in manner. The Sheriff has specified that the searches only be conducted by officers of the same sex as the inmate. Furthermore, the

---

11. *See Hudmon Depo. at 65:9—66:7:*
Q. You were completely naked?
A. Uh-huh (positive response).
Q. And did she tell you to do that?
A. Yes.
Q. She said—Again, tell me her exact words.
A. Take off your clothes.
Q. But did she specify take off both your outer garments and your underwear?
A. **She may have said that. I don't know.** But I took all my clothes off. Now, I mean, she told me either to take them all off, or it was—I mean, I knew what I was supposed to do because she told me what to do.
Q. When she said remove your clothes, you interpreted that to include your undergarments?
A. Yes. That's what she meant, **whether she said that specifically or whether it was implied.** But she told me to take off my clothes and I did.

Sheriff and his policies require that the searches be conducted in a manner to minimize the embarrassment to the inmates. The court is mindful that Ms. Magill and Ms. Hudmon were, despite these efforts, still embarrassed by the process. Nevertheless, their particular emotional reactions do not determine the Constitutionality of these searches. In undertaking his duties as jailer, the Sheriff may infringe on the sensibilities of the inmates. Such infringement is to be expected in a penal institution.

Plaintiff has raised an objection because the inspections are conducted on everyone who enters the institution, and not just on those who pose some particular threat. In *Peachtree City*, the Eleventh Circuit appears to place at least some emphasis on the idea that the strip search there is conducted "in the least intrusive manner." *Id.* It is not certain from the opinion whether the court is placing that requirement on the officers only because the searched party is a juvenile, and only an arrestee. Indeed, if the Eleventh Circuit were meaning to place the requirement on the Sheriff in a case such as this one, that ruling would appear to be contrary to the Supreme Court. *Bell*, 441 U.S. at 559 n. 40, quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–57, 96 S.Ct. 3074, 49 L.Ed.2d 1116 n .12 (1976) (" '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers' ").

Nevertheless, even if the Eleventh Circuit means for this requirement to be placed on searches of adult inmates, the court would note that it believes the searches here were conducted by the least intrusive means. Use of a mere pat-down would not, as the Lee County officials noted, find small drugs or weapons. In addition, use of metal detector would not find drugs or other non-metallic objects. In addition, the plaintiff has not explained how the jail officials are supposed to determine who poses a more particularized threat to bring in a weapon or drugs or money, etc., so that only those people could be searched. Drug addicts may commit any number of crimes, so it would not make sense to search only drug offenders for such contraband. In addition, those who pose threats to bring weapons apparently include first-time offenders.[12] It is a reasonable response to these threats for the Sheriff to simply search everyone who enters the inmate population.

■ *Place of the Searches.* Plaintiff has also objected to the searches because of the place where they were performed. The court has to admit that it was given some pause because of this issue at the dismissal stage, when the allegations were that an inmate was forced to undress naked in a room with a view. The facts, however, have clarified these allegations to a great degree. Plaintiffs are, consistent with the policy, only being asked to take their outer clothes off. Furthermore, neither Plaintiff here noticed an observer, and there is no evidence before the court that anyone has ever been allowed to observe the search other than the officer administering it. The only evidence before the court regarding the window is that it was in the building when the searches started; that the officers block it when a search is occurring; that it is difficult to peer through; and that a second officer can see if anyone is

**12.** The jail and its lawyers have even shown that if individual decisions were made on who to search, these two plaintiffs would be good candidates. Chief Deputy Torbert testified in his affidavit that it is often the first-time offender who is frightened enough by the prospect of jail to sneak in weapons. In addition, defendant has also argued in the motions that searches of the plaintiffs here would have been justified because the plaintiffs fit a suicide profile: first-time offenders, very upset, etc. No testimony has been offered that the latter reason was the justification at the time that the search was conducted. It will not, therefore, be considered. *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[d]etermining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception.' ").

peering through so as to stop them.[13] There is no reason not to conclude that it is a reasonable place to perform the searches in question.

## IV. CONCLUSION

The Supreme Court noted that searches could sometimes be abused, and that such abuse should not be condoned. *Bell*, 441 U.S. at 560. In the present suit, however, the court is not asked to address whether there has been abuse; rather, the court is only asked to determine if the official policy or custom of the Lee County Jail requiring strip searches is unconstitutional. Balancing the rights of the inmates against the legitimate concerns of the institution, the court finds the policy to be constitutional. If the Supreme Court can approve a strip search and body cavity search procedure on detainees who have had a contact visit with the public, indeed a presumably supervised contact visit with the public, surely this court must approve the present search. Likewise, if the Eleventh Circuit can approve stripsearches of juveniles who are not even going to be placed into a cell, this court should approve the present search. The Lee County search policy is a reasonable response to legitimate concerns.[14] Such a search, even if offensive to Ms. Magill and Ms. Hudmon, does not violate the Constitution.

---

**13.** Furthermore, the court would note that such a window would constitute a security measure itself. If an inmate were to become hostile during the search, a second officer could observe the situation before entering the room.

**14.** The court is not expressing any opinion on whether the Sheriff was acting as an official policymaker for Lee County in this situation. The court need not address that question, nor does the court have to address the issue of qualified immunity.