[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/29/99
THOMAS K. KAHN
CLERK

No. 98-2651

D.C. Docket No. 96-63-CIV-FTM-17D

JOSEPH MACUBA,

Plaintiff-Appellee,

versus

MATTHEW DEBOER, MICHAEL YOUSEFF, Charlotte Commissioners, individually and in their official capacities,

Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Florida

**(October 29, 1999)**

Before TJOFLAT and BIRCH, Circuit Judges, and BRIGHT*, Senior Circuit Judge.

_____

*Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

Appellee Joseph Macuba brought this 42 U.S.C. § 1983 (1994) action for money damages against the County of Charlotte, Florida, and two members of its Board of Commissioners, appellants Matthew DeBoer and Michael Youseff, for infringement of his First Amendment rights. Macuba sought relief against the two Commissioners in both their official and individual capacities. Macuba alleges that the defendants abolished his position with the county (by reorganizing four of its administrative departments) and denied him employment in another position because of his whistle-blowing activities and frequent contact with the press. Following some discovery, DeBoer and Youseff moved for summary judgment on Macuba's claim against them in their individual capacities; they contended that they were immune from suit under the doctrines of absolute and qualified immunity. The district court denied their motion, and they brought this interlocutory appeal. We reverse.

## I.

Joseph Macuba was, until 1995, employed as a License Investigator in Charlotte County's Building Department. Part of his job was to investigate complaints against builders and the failure of his co-workers to enforce county building codes. In October 1992, the County received a complaint from a couple named Sam and Harriot Cimaroli alleging that the builder of their home had violated

2

various building codes. Jeffrey DeBoer, the Building Director (and head of the department), reviewed the complaint and asked Macuba to investigate. Macuba concluded that the builder had failed to comply with several code provisions and recommended that the builder be disciplined by the "Construction Industry Licensing Board." Without obtaining DeBoer's permission, Macuba leaked the results of his investigation to the media, including Hugo Spatz (an editor of a "local concerned citizens newspaper publication"), who had often been critical of the county administration. The media, in turn, questioned DeBoer about the situation.

This was not the first time that an investigation conducted by Macuba resulted in inquiries from the media. Jeffrey DeBoer found these inquiries unpleasant, and he made his feelings known to Macuba. DeBoer knew that Macuba had frequent contacts with members of the press, and at some point he told Macuba that Macuba either cut back on his contacts with the media or look for another job. Macuba reported DeBoer's threat to Tom Frame, then the County Administrator. In addition, he complained to Frame about DeBoer's overall handling of the department.

In July 1993, Frame fired Jeffrey DeBoer. In 1994, Jeffrey's brother, appellant Matthew DeBoer, ran for one of the vacancies on the five-member Charlotte County

3

Board of Commissioners; he was elected in November. Prior to his election, Matthew sent an anonymous letter criticizing Macuba to the Board of Commissioners.[1]

Appellant Michael Youseff was elected to the Board of County Commissioners in November 1992; he served one term, until 1996. Soon after his election, if not beforehand, Youseff developed a dislike for Hugo Spatz, who, in reporting on the local government, treated the county administration unfairly (in Youseff's opinion). In late 1994 or early 1995,[2] Youseff asked Spatz where he was obtaining the information for his stories. Spatz revealed that Macuba was one of his principle sources. In February 1995, Youseff wrote the county attorney that Macuba was responsible for some of Spatz's criticism of the county government.

In March 1995, the Board of Commissioners appointed Jan Winters County Administrator, to replace Tom Frame, who had resigned. Shortly after his appointment, Winters reviewed the County's four land use departments: planning, zoning, building, and land development. All four were administered separately, but they had some overlapping functions. Winters proposed that the four departments be consolidated into one department, the Community Development Department ("CDD"); this would save resources and provide owners and contractors with "one-

---

[1] The letter is apparently not in the record, and neither the record nor the parties' briefs indicate the nature of the criticisms.

[2] The record is unclear with respect to the date.

4

stop" shopping for permit applications. Winters presented his proposal to the Board of Commissioners at a June 1995 meeting of the Board. The Board, with DeBoer and Youseff voting, approved the proposal by a vote of 5-0. At the same meeting, Winters announced that he had chosen Max Forgey to head the CDD, and he asked the Board to endorse his decision. The Board did so with a vote of 5-0.

Winters and Forgey thereafter began working on the reorganization, eliminating certain positions and creating others. Among other changes, they eliminated the Building Department's three license-inspector positions, including Macuba's. A letter from the County's personnel department informed Macuba that his position had been eliminated, but that he could apply for a position in the new department.

In September 1995, at a meeting of the Board of Commissioners, Winters briefed the Board on the status of the reorganization. Among the positions being created in the new CDD were a Code Compliance Supervisor position and five Code Compliance Officer positions. Macuba applied for both positions.

Winters delegated the responsibility for filling all of the open positions in the CDD to Forgey. Forgey then delegated the responsibility of interviewing and recommending applicants for Code Compliance Supervisor and Code Compliance Officer to two subordinates, Socrates Shinas and John Bennett. They interviewed Macuba but did not recommend him for the Supervisor position. Out of seven

applicants for the five Officer positions, Bennett ranked Macuba fourth (which meant that he was qualified for the position) and Shinas ranked him seventh (which meant that he was not). To settle the question whether Macuba was one of the two least qualified applicants, Forgey asked Jock Robertson, then Acting Planning Director for the County, to make an independent evaluation of all applicants and determine the two least qualified for the Officer positions. Robertson was instructed to classify each applicant as "Very Well Qualified," "Qualified," "Marginal," or "Not Qualified." He rated Macuba "Not Qualified" and placed him at the bottom of the list. Based on the recommendations of Shinas, Bennett, and Robertson, Forgey did not offer Macuba a position as either Supervisor or Officer.

In December 1995, at a meeting of the Board of Commissioners, Winters presented the Board with a final draft of the CDD organizational structure for approval. The Board approved the draft by a vote of 5-0 (including appellants' votes). Winters, ratifying the choices made by Forgey, subsequently filled the positions created by the plan.

Macuba thereafter brought this suit. Macuba's complaint alleges that the county and appellants DeBoer and Youseff abolished his position as a License Investigator in the Building Department and denied him employment in the CDD, as either Code Compliance Supervisor or Code Compliance Officer, because of his

whistle-blowing activity and his communication with the media. The defendants'

conduct, the complaint asserts, infringed Macuba's rights under the First and

Fourteenth Amendments and rendered the defendants amenable to suit under 42

U.S.C. § 1983 (1994).[3]   Macuba's complaint also alleged that the defendants were

amenable to suit under the Florida Whistle-blower's Act, Fla. Stat. Ann. § 112.3187

(West 1992).[4]

In their answers, the defendants denied liability. Responding to Macuba's

claims in their individual capacities, DeBoer and Youseff interposed the affirmative

defenses of absolute immunity (at all times they were acting as legislators) and

qualified immunity (their conduct did not violate a clearly established principle of

First Amendment law). DeBoer and Youseff moved for summary judgment on the

basis of those affirmative defenses.[5]

---

[3] The free speech protections of the First Amendment have been made applicable against the states by incorporation into the Fourteenth Amendment. See Fiske v. Kansas, 274 U.S. 380, 386-87, 47 S. Ct. 655, 657, 71 L. Ed. 1108 (1927). In his complaint, Macuba did not specifically allege an infringement of his Fourteenth Amendment rights, but it is obvious he is alleging that a state entity, and not the federal government, violated his rights.

[4] The statute prohibits "[a]n agency or independent contractor" from "tak[ing] any . . . adverse personnel action against an employee for disclosing information pursuant to the provision of this section" and also prohibits "tak[ing] any adverse action that affects the rights or interests of a person in retaliation for the person's disclosure of information under this section." Fla. Stat. Ann. § 112.3187(4)(a), (b). The statute provides that an aggrieved person "may, after exhausting all available contractual or administrative remedies, bring a civil action in any court of competent jurisdiction within 180 days after the action prohibited by this section." Id. § 112.3187(8)(c).

[5] The county also moved for summary judgment, contending that both Macuba's constitutional claim and his pendent state law claim were meritless. The district court denied the

In passing on their motion, the district court considered and rejected the qualified immunity defense, concluding that the evidence, viewed in the light most favorable to Macuba, established conduct violative of the First Amendment.[6] In its dispositive order denying the motion, the court did not address the defense of absolute immunity, even though the defendants' motion relied in part on that defense. Nonetheless, for purposes of this appeal, we consider the court to have rejected the defense.

DeBoer and Youseff now appeal the district court's denial of their motion for summary judgment. They contend that the court should have granted them both absolute and qualified immunity.

## II.

We have jurisdiction to consider this interlocutory appeal. See Ellis v. Coffee County Bd. of Registrars, 981 F.2d 1185, 1189 (11th Cir. 1993) ("[D]enial of a claim of absolute

county's motion. The court's ruling is not before us in this appeal.

[6] In its order, the district court stated that it was considering the defense of qualified immunity after viewing the evidence in the light most favorable to Macuba, and then went on to observe that disputed issues of material fact were present. The court apparently overlooked the proposition that, in passing on the defense of qualified immunity on summary judgment, the court eliminates any material fact issues that may exist by viewing the evidence in the light most favorable to the plaintiff. By viewing the evidence in this way, the court reduces the case to a question of law; whether, under the best-case-scenario for the plaintiff thereby created, the defendant's conduct violated the plaintiff's constitutional right(s). See Smith v. Lomax, 45 F.3d 402, 404 n.7 (11th Cir. 1995).

immunity is an immediately appealable interlocutory order."); Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision.' ").  Our review is de novo, and we take the case in the light most favorable to the plaintiff.  See Cottrell v. Caldwell, 85 F.3d 1480, 1486 & n.3 (11th Cir. 1996).  Our initial task is to determine whether DeBoer or Youseff retaliated against Macuba because he exercised a First Amendment right.  If either defendant did so while acting in a legislative capacity as a member of the Board of Commissioners, he is entitled to absolute immunity from suit.  See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 406, 99 S. Ct. 1171, 1179, 59 L. Ed. 2d 401 (1979).   If either defendant retaliated against Macuba in a non-legislative capacity, then we must determine whether his conduct had been proscribed by Supreme Court or Eleventh Circuit precedent such that "a reasonable person in [his] position would have had notice that his actions were unlawful." Mencer v. Hammonds, 134 F.3d 1066, 1070 (11th Cir. 1998); see also Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998).  With these principles in mind, we consider Macuba's case against the appellants.

Macuba's case is based on two events.  The first event was the abolition of Macuba's position as License Inspector in the Building Department.  Macuba

contends that the Board of Commissioners abolished this position because appellants wanted to punish him; the need to reorganize the land use departments was simply a pretext. The second event was the county's refusal to hire Macuba for either of the two newly-created positions for which he applied. In subpart A, we conclude that appellants are entitled to absolute immunity with respect to the first event. In subpart B, we conclude that appellants are entitled to qualified immunity with respect to the refusal to hire.

A.

Local legislative bodies enjoy absolute immunity when exercising functions " 'in the sphere of legitimate legislative activity.' " Bogan v. Scott-Harris, 523 U.S. 44, 54, 118 S. Ct. 966, 972, 140 L. Ed. 2d 79 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376, 71 S. Ct. 783, 788, 95 L. Ed. 1051 (1951)). In Bogan, plaintiff lost her job as health and human services administrator when the city council eliminated her department, of which she was the sole employee. Plaintiff claimed that the council took this action at the urging of the mayor and the council's vice president (who voted to eliminate her department) because plaintiff had exercised a First Amendment right by filing a complaint against a co-worker. In response to her suit for damages under 42 U.S.C. § 1983, the council vice-president asserted the defense of absolute immunity. The district court and the court of appeals rejected her defense. The

Supreme Court, however, upheld it. It concluded that members of a city council are entitled to the same absolute immunity that members of Congress and state assemblies enjoy.[7] Id. at 49, 118 S. Ct. at 970. In the Court's view, the act of "voting for an ordinance [was] . . . quintessentially legislative." Id. at 55, 118 S. Ct. at 973. Addressing the plaintiff's argument that the council vice-president should not be immune from suit because she had acted with the intent to retaliate, the Court, affirming its holding in Tenney, held that the "motive or intent" of the defendant is irrelevant in determining whether absolute immunity applies. Id. at 54-55, 118 S. Ct. at 973.

When DeBoer and Youseff voted to reorganize the land use departments, and later when they approved the CDD structure, they were exercising a "quintessentially legislative" function. The county's code invests the Board of Commissioners with "all legislative authority" and "all powers of local self-government not inconsistent with general law or special law." Charlotte County (Fla.) Code, Home Rule Charter, Art. II § 2.2(D). This includes the power to "take action on programs for improvement of the county and the welfare of its residents." Id. Therefore, insofar as Macuba rests

---

[7] In Woods v. Gamel, 132 F.3d 1417 (11th Cir. 1998), which was announced a few months before Bogan, we came to the same conclusion with regard to county commissioners.

11

liability on the elimination of his position as a License Investigator, appellants are entitled to absolute immunity.

## B.

Macuba contends that, in an effort to punish him for exercising his First Amendment rights, DeBoer and Youseff persuaded Forgey to reject his application for either of the newly-created Code Compliance positions. Macuba offered evidence that DeBoer hated Macuba because DeBoer believed that Macuba was responsible for blowing the whistle on his brother Jeffrey and getting him fired. Macuba also offered evidence that Youseff hated Macuba after he learned from Spatz that Macuba had been leaking the results of his (Macuba's) investigations to the press. We assume for the sake of discussion that this evidence establishes that appellants had the intent to

retaliate against Macuba.[8]  What Macuba has not shown, however, is that appellants had anything to do with Forgey's decision not to hire him.

DeBoer's and Youseff's  positions as county commissioners gave them no express authority to make routine personnel decisions – that authority was vested in the county administrator, Jan Winters. See Charlotte County (Fla.) Code § 1-2-80(11).[9] Winters assigned Forgey the task of filling the new CDD positions, including Code Compliance Supervisor and the five Code Compliance Officer positions. Forgey delegated the job of interviewing and recommending candidates for these positions to Bennett and Shinas.  Neither recommended Macuba for the Supervisor position.  When the two disagreed as to who should fill the five Compliance Officer positions, Forgey brought in an outside evaluator, Robertson, who concluded that

---

[8] The parties devote significant space in their briefs to the Supreme Court's recent decision in Crawford-El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998), which rejected a requirement that a plaintiff in a § 1983 case produce clear and convincing proof of improper motive when motive is an essential element of the constitutional claim.  The apparent disagreement between the parties is whether, after Crawford-El, a district court may consider a government official's intent or motive in determining if the official is entitled to qualified immunity, when the claim is for First Amendment retaliation. We have not decided what effect, if any, Crawford-El has on our holdings, such as Mencer v. Hammonds, 134 F.3d 1066, 1070-71 (11th Cir. 1998), and Walker v. Schwalbe, 112 F.3d 1127, 1132-33 (11th Cir. 1997), which concluded that a district court should consider, for qualified immunity purposes, evidence of improper motive, but only when motive is part of the constitutional claim.  We decline to address this issue here because, even if Macuba has shown that appellants dislike him, he has not produced sufficient evidence to establish they caused him not to be hired.

[9] In fact, county commissioners are prohibited from interfering with employees supervised by the county administrator except "for the purposes of inquiry and information." Charlotte County (Fla.) Code, Home Rule Charter, Art. II § 4.1(C).

13

Macuba was the least qualified applicant. On the basis of Robertson's evaluation, and Shinas' and Bennett's recommendations for both jobs, Forgey rejected Macuba's application.

Winters, Forgey, Bennett, and Robertson all filed affidavits with the district court, and all said that neither DeBoer nor Youseff influenced them in selecting those who would fill the Code Compliance positions. Robertson said that no one spoke or communicated with him about his evaluations of the applicants. He relied solely on their applications and the description of the positions they were seeking. In sum, as to Bennett, Shinas, and Robertson, Macuba produced no evidence that DeBoer or Youseff contacted them or attempted in any way to influence their recommendations.

In concluding that a reasonable jury could find that appellants caused Macuba not to be hired in the CDD, the district court primarily relied on two pieces of evidence (besides Macuba's affidavit). The first was an organizational chart, prepared by Forgey and stamped "DRAFT," which listed Macuba as a "possibility," along with another current employee, for the position of Building Director. This suggests that Forgey at one time considered Macuba qualified for the position of Building Director; it does not prove Forgey found him qualified (let alone more qualified than others who applied) for any other positions. In any event, Forgey delegated the responsibility for selecting the Code Compliance positions to others, and when a conflict arose, brought

14

in an outsider (Robertson) to break the tie. It would not be reasonable to infer from this evidence alone that DeBoer and Youseff influenced Forgey not to hire Macuba, given that Forgey acted solely on his subordinates' recommendations.

The district court also relied heavily on the deposition and subsequent affidavit of Richard Leonard, a former county commissioner. Leonard left the Board of Commissioners when his term expired in 1994; hence, he was not a member of the Board when it entertained Winters' proposal to reorganize the land use departments. Leonard testified that he had spoken with a number of county employees who told him that Youseff was heavily involved in the reorganization of the departments. He stated that Forgey told him that Youseff was "in [Forgey's] office so much he felt he should put in a desk and chair for [Youseff]." Leonard also claimed that DeBoer and Youseff had a "hit list" of employees, including Macuba, whom they wanted fired, and that Youseff had at one point (prior to Leonard's departure from the Board) given this hit list to Leonard's father in an attempt to influence Leonard.[10] Leonard also claimed that Forgey told him that Macuba was the most qualified person in the Building Department, and that the land use departments were being reorganized as a means of executing Youseff's plan to have certain people, including Macuba, fired.

---

[10] For some reason not disclosed by the record, Macuba did not produce an affidavit from Forgey's father in opposing appellants' motion for summary judgment.

Most, if not all, of Leonard's testimony regarding the county's decisions to reorganize the land use departments (thus eliminating Macuba's position) and to reject Macuba's application for the Code Compliance positions in the CDD, is rank hearsay. The district court did not deal with this problem when it considered Leonard's testimony; it simply factored the testimony into its ruling. This may be, in part, because of apparent confusion in the federal courts on the extent to which hearsay may be considered in ruling on a motion for summary judgment.

The general rule is that inadmissible hearsay[11] "cannot be considered on a motion for summary judgment." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) (citing cases from six Circuits). Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." This rule also applies to testimony given on deposition. See Randle v. LaSalle Telecomms., Inc., 876 F.2d 563, 570 n.4 (7th Cir. 1989).

Some courts, including our own, appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for

_____

[11] By inadmissible hearsay we mean (for purposes of this opinion only) an out-of-court statement, presented for the purpose of establishing the truth of the statement's contents, that does not fall within an exception to the hearsay rule. See generally Fed. R. Evid. 801-804.

16

summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form." See Wright v. Southland Corp., __ F.3d __ (11th Cir. Sept. 3, 1999); Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996); McMillian v. Johnson, 88 F.3d 1573, 1584-85 (11th Cir. 1996); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1246 (3d Cir. 1993); Raby v. Baptist Med. Ctr., 21 F. Supp. 2d 1341, 1353-54 n.9 (M.D. Ala. 1998); Coker v. Tampa Port Auth., 962 F. Supp. 1462, 1466-67 (M.D. Fla. 1997). These courts have coined these phrases from language appearing in the Supreme Court's decision in Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986),[12] which held that a nonmoving party, in opposing a motion for summary judgment, need

---

[12] The two phrases quoted in the text derives from two passages in Celotex. The first passage is:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

477 U.S. at 324, 106 S. Ct. at 2553. The second passage (which comes later) states that "the Court of Appeals declined to address either the adequacy of the showing made by respondent in opposition to petitioner's motion for summary judgment, or the question whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial." Id. at 327, 106 S. Ct. at 2554-55. At no time does the Court use the phrase "reducible to admissible form," a phrase that has appeared in numerous decisions. In the first passage quoted above, the Court is merely noting that Rule 56(c) permits the parties to rely on submissions that could not (in the form they are presented to the court) be admitted into evidence at trial. In the second passage, the Court refers to the problem we have here – whether the hearsay statements contained within Leonard's deposition and affidavit would be admissible at trial were Leonard to take the stand and Macuba sought to elicit those statements from him.

17

not produce affidavits, but may refer the district court to "pleadings, depositions, answers to interrogatories, and admissions on file," as provided by Fed. R. Civ. P. 56(c).[13]

We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose. For example, the statement might be admissible because it falls within an exception to the hearsay rule,[14] or does not constitute hearsay at all (because it is not offered to prove the truth of the matter

---

[13] The documents at issue in Celotex, which involved a wrongful death action, were "a transcript of a deposition of the decedent, a letter from an official of one of the decedent's former employers whom petitioner planned to call as a trial witness, and a letter from an insurance company to respondent's attorney." 477 U.S. at 320, 106 S. Ct. at 2551. Because the Court of Appeals had not addressed whether these documents were sufficient to create a genuine issue of material fact or whether the documents would be admissible at trial, the Supreme Court did not decide either issue. Id. at 326-27, 106 S. Ct. 2554-55.

[14] See Fed R. Evid. 801(d), 803, & 804; Supermarket of Marlington, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 126-28 (4th Cir. 1995) (finding that hearsay fell under 804(b)(1) exception, and therefore should have been considered by district court in motion for summary judgment). Of course, under the Federal Rules of Evidence, the categories listed under 801(d) are not formally labeled "exceptions," even if they function as exceptions to the hearsay rule for most purposes.

18

asserted),[15] or is used solely for impeachment purposes (and not as substantive evidence).[16]

Our cases, in drawing on one or both of the quoted phrases, are not to the contrary. In Offshore Aviation v. Transcon Lines, Inc., 831 F.2d 1013 (11th Cir. 1987), the admissibility of the out-of-court statement, which was contained in a letter attached to a deposition, was not contested. Moreover, it is unclear from the panel opinion whether the deponent testified (from personal knowledge) to the essence of the statement or whether the statement, as presented, constituted rank hearsay. In Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514 (11th Cir. 1993), the out-of-court statements appeared in "various materials, including newspaper articles." Id. at 1530. The panel's opinion does not reveal the contents of the objected to statements; it only states that the materials were presented to show that the City acted with a "sectarian motivation." Id. The court did not pass on the questions whether, at trial, the materials would be inadmissible as rank hearsay,

---

[15] See Fed. R. Evid. 801(c). For example, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c), Advisory Committee's Note. See, e.g., Akin v. Q-L Invs., Inc., 959 F.2d 521, 530 (5th Cir. 1992) (finding out-of-court statements were offered to prove reliance, not for their truth, and therefore should have been considered by district court in motion for summary judgment).

[16] See Fed. R. Evid. 607, 613; Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1312 (8th Cir. 1993) ("[P]utting . . . evidence in question through impeachment could defeat a motion for summary judgment when the moving party has the burden of persuasion.").

admissible as non-hearsay, or admissible under an exception to the hearsay rule. In

McMillian v. Johnson, 88 F.3d 1573 (11th Cir. 1996), the appellant contended that the

district court disregarded Celotex and our decisions in Church of Scientology and

Offshore Aviation when it excluded on summary judgment hearsay statements

contained in an affidavit. According to the appellant, the statements, although in

"inadmissible form," could be presented in admissible form at trial. Id. at 1584. The

panel disagreed. It read Celetox, and our cases applying Celetox, "as simply allowing

otherwise admissible evidence to be submitted in inadmissible form at the summary

judgment stage, though at trial it must be submitted in admissible form." Id.

(emphasis added). Here, as in McMillian, the hearsay statements were not "otherwise

admissible."[17] Finally, in Pritchard v. Southern Co. Servs., 92 F.3d 1130 (11th Cir.

1996), after citing Church of Scientology and Offshore Aviation for the proposition

that "inadmissible hearsay may sometimes be considered by a court when ruling on

---

[17] The McMillian panel also considered (in addition to the question whether the challenged statements could be introduced to prove the truth of their contents) whether the district court should have considered the out-of-court utterances because they constituted impeachment. The court disposed of the issue as follows:

[w]hile the statements may be admissible for that purpose, the district court correctly noted that such impeachment evidence is not substantive evidence of the truth of the statements . . . . Such potential impeachment evidence, therefore, may not be used to create a genuine issue of material fact for trial. Because [the] statements will be admissible at trial only as impeachment evidence, the statements do not create a genuine issue of fact for trial.

88 F.3d at 1584. It is possible, however, depending on the circumstances of the case, that impeachment evidence could create a genuine issue of material fact. See supra note 16.

a summary judgment motion," the court relied on <u>McMillian</u> in holding that the challenged hearsay statements could not be "reducible to admissible form" at trial. <u>Id.</u> at 1134.[18]

With these principles in mind, it should be apparent that the district court erred in considering the hearsay testimony of Leonard. First, all of the statements Leonard claims were made to him were being offered for their truth: that DeBoer and Youseff had a "hit list" of people in the land use departments, including Macuba, they wanted fired; that Macuba was on the "hit list;" and that the sole purpose of the reorganization

---

[18] Our research reveals that, for the most part, district courts in this circuit have properly understood the phrase "reducible to admissible form at trial" and adhered to the principles we have set out above. <u>See, e.g.</u>, <u>Raby v. Baptist Med. Ctr.</u>, 21 F. Supp. 2d 1341, 1353-54 n.9 (M.D. Ala. 1998) (considering only those portions of a submitted deposition "which appear to be based on . . . personal knowledge"); <u>Marshall v. Planz</u>, 13 F. Supp. 2d 1246, 1255-56 (M.D. Ala. 1998) (refusing to consider hearsay when offering party did not provide affidavit from declarant); <u>Bush v. Barnett Bank</u>, 916 F. Supp. 1244, 1256 (M.D. Fla. 1996) (refusing to consider hearsay because it did not "fall into any nonhearsay or exception to hearsay category"). We are, however, somewhat concerned about <u>Coker v. Tampa Port Auth.</u>, 962 F. Supp. 1462 (M.D. Fla. 1997). In <u>Coker</u>, plaintiff had charged defendant, his former employer, with a violation of the Americans with Disabilities Act. One of the issues at the summary judgment stage was whether plaintiff was "disabled" for purposes of the Act. Plaintiff had submitted the testimony of his physician, but he also submitted a letter from defendant's insurance company, written to plaintiff, which stated that "[y]our doctor has reported that you have completed treatment and may return to work, but that you will have some permanent impairment from your on-the-job-accident." <u>Id.</u> at 1466. The court held that it could consider this hearsay because "there is no suggestion that the hearsay statement regarding plaintiff's permanent impairment cannot be reduced to admissible form at trial through the doctor's testimony." <u>Id.</u> at 1467. This is not a correct statement of the law. Plaintiff's doctor certainly could not testify at trial to what an insurance company said to plaintiff in a letter, because, aside from the letter, the doctor would have no personal knowledge of that. What the district court should have said was that plaintiff had demonstrated a genuine issue of material fact by submitting evidence (the testimony of the doctor) which could later be given in an admissible form (by the doctor testifying at trial).

21

into the CDD was to accomplish this. Second, none of the statements made to Leonard would be admissible at trial under an exception to the hearsay rule.[19] Finally, even though the statements made to Leonard might be admissible to impeach Forgey (if he testified), they would not be admissible as substantive evidence. See McMillian, 88 F.3d at 1584.

In sum, to make out a case for a jury, Macuba had to demonstrate that appellants did more than just make noise about disliking him; he had to establish a causal connection between appellants' feelings and Forgey's decision not to hire him. If all Macuba can prove is that appellants were angry because he exercised his First Amendment rights, and that Forgey rejected his application, then no constitutional violation occurred. But this is all that he has shown. Given nothing more than this showing, we must conclude that appellants are entitled to qualified immunity in their individual capacities.

---

[19] The most likely candidates for an exception to the hearsay rule are the statements made by Forgey to Leonard, which one might argue fall under the "Statement against interest" exception. See Fed. R. Evid. 804(b)(3). In order for a hearsay statement to be admitted under this exception, it must be "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Id. Forgey's alleged statements to Leonard, while unflattering to Youseff, hardly subjected him to civil or criminal liability. In any event, this exception requires that the declarant be unavailable, and since Forgey submitted an affidavit to the court, we have no reason to believe this is the case. See Fed. R. Evid. 804(a).

IV.

For the foregoing reasons, we reverse the denial of summary judgment and instruct the district court to enter judgment for Youseff and DeBoer in their individual capacities on Macuba's First Amendment claim.

REVERSED.

BRIGHT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority in this case except for the grant of qualified immunity to the defendants. On that issue I dissent.

The magistrate judge denied the defendants' motion for summary judgment based on the following statement of facts:

> In opposition to the Youseff and Matthew DeBoer's Motion for Summary Judgment, the plaintiff, Joseph Macuba, filed his own affidavit and deposition which basically substantiated the statements in the Complaint filed in this cause. In his depositions, Macuba also stated that the Director of Personal Relations, Ray DeArriba informed him that due to Youseff and Matthew DeBoer's influence, Macuba likely would not obtain a position in code compliance because of his association with Hugo Spatz and his reporting the wrongdoing on the part of Jeffrey DeBoer and Robert Kirby (employees in the Building Department), causing both those individuals to be terminated.
>
> To further bolster his position, Macuba attached the following to his affidavits: a copy of his report which caused Robert Kirby to resign and Jeff DeBoer to be terminated; a copy of Matthew DeBoer's deposition in which DeBoer admitted to sending an anonymous letter to the Charlotte County Commissioners which was derogatory to Macuba and to Macuba's supervisor Tom Frame; a copy of a news release and Charlotte Sun Herald newspaper article in which Youseff admitted he forced the resignation of five highly placed county employees; and, a copy of a draft organizational chart prepared by Max Forgey, the Planning Director for the new Community Development Department that reflects that Forgey was at one time considering Macuba for the position of Building Director (head of the building department) prior to Macuba being terminated as being the least qualified employee. All of these attachments, corroborate the allegations set forth in the amended complaint.

24

Also, in opposition to the Defendants' Motion for Summary Judgment, Plaintiff filed the affidavit and deposition of one Richard Leonard, a former Charlotte County Commissioner, whose testimony corroborated the Plaintiff's testimony regarding the allegations set forth in the Complaint. Mr. Leonard testified in both his deposition and his affidavit that he was advised by Max Forgey, Elliott Kampert, Ben Cotroneo and Paulette Horne that the reorganization of the planning, zoning, building and land development departments was orchestrated by Matthew DeBoer and Youseff. Mr. Leonard advised that because of his past association with the county as a county commissioner that the various employees of the county felt comfortable in talking with him. Leonard testified that Mr. Forgey complained that Commissioner Youseff was in his office so often that he felt he should put in a desk and chair for him. Mr. Leonard testified that he learned through various employees including the ones mentioned that both Youseff and Matthew DeBoer had a hit list of employees that they wanted eliminated from their county positions and systematically used their positions to eliminate those personnel. Mr. Leonard testified that Commissioner Youseff went to the extreme of having a meeting with Leonard's father while Richard Leonard was still a commissioner and gave his father a hit list and advised him of various things that he, Richard Leonard should do, otherwise his career could be in jeopardy. The document given to his father spelled out the removal of certain people and the transfer of certain personnel. Mr. Leonard testified that he was so concerned that he turned this document over to the county attorney who turned over a copy of that to the Sheriff's Department for investigation. Mr. Leonard testified that Commissioner Youseff stated that Mr. Frame, his administration, his followers and his cronies were nothing but a bunch of idiots and that they all needed to go. Finally, Mr. Leonard testified during his deposition that Mr. Forgey told him that Joe Macuba was the most qualified applicant that he had for the job prior to the time that he was not accepted nor given an available position. Based upon all of the testimony of Macuba and Leonard and the documents and affidavits on file, this Court has determined that there are material facts in this case which are in dispute and would prevent the granting of summary judgment.

. . . .

> If the Court accepts the following facts in a light most favorable to the Plaintiff then there are material facts in dispute regarding the retaliation. The facts are that the Defendants were angry with the Plaintiff because the Plaintiff by his investigative report caused Jeffrey DeBoer, (Matthew DeBoer's brother and an ally of Youseff) to have his employment terminated with the County, that it became known that the adverse publicity concerning mismanagement and corruption by county officers was being leaked to the press by the Plaintiff through Hugo Spatz, that both of these Defendants had a hit list of employees that they wanted separated from the county, and that these Defendants would use the power of their office to cause those employees to be terminated. A government official's state of mind is a critical element in first amendment retaliatory claims and must be considered in this case. Because Plaintiff has established a genuine issue of material fact as to retaliation, it must be assumed at this stage that the Defendants did retaliate against him for his speech.

Record Excerpts for Appellants' Initial Br., Tab 116 at 9-12 (citations omitted). The district court confirmed and approved the foregoing determination by the magistrate judge.

In their reply brief, appellants DeBoer and Youseff refer to an "inaccurate statement of facts by appellee," and assert that some of the information furnished by witness Leonard did not represent first hand knowledge. Despite these contentions, the reply brief does not otherwise attack the admissibility of the evidence. Indeed, some of the statements given to Leonard by employees of the County may well have represented admissible employee statements, or may otherwise be provable or

26

admissible at trial by the individual making the statement. However, the record remains incomplete on foundation and the manner in which this evidence would be presented at trial.

The sum total of evidence recited above demonstrates that a jury issue exists relating to defendants' liability and that summary judgment for defendants on the basis of qualified immunity is an inappropriate resolution.[20] Accordingly, I dissent. The district court should be permitted to determine what evidence is admissible in further proceedings and make pretrial and trial rulings in conformity to admissible evidence.

I would affirm the district court's ruling rejecting the defense of qualified immunity on defendants' motion for summary judgment, and I would remand this case to the district court for further proceedings.

---

[20]The defendants' argument on appeal rested on the "objective reasonableness" of their action, asserting that their subjective intention, if any, to rid the county of Macuba as an employee was irrelevant.